RECORD NO. 14-1966

In The

# United States Court of Appeals
## For The Fourth Circuit

## NANCY A. WILLIAMS, on her own behalf and on behalf of all others similarly situated,

*Plaintiff – Appellant*,

**v.**

## GENEX SERVICES, LLC, f/k/a GENEX SERVICES, INC.,

*Defendant – Appellee*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE**

_____

**BRIEF OF APPELLANT**

_____

Nicholas Woodfield
R. Scott Oswald
EMPLOYMENT LAW GROUP, PC
888 17th Street, NW, 9th Floor
Washington, DC  20006
(202) 261-2812

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1966          Caption: Nancy Williams v. Genex Services, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Nancy Williams and Sandy Sherman
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: 9/29/2014

Counsel for: Nancy Williams and Sandy Sherman

## CERTIFICATE OF SERVICE
*****************************

I certify that on 9/29/2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Russell R. Bruch, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202.739.3000
Facsimile: 202.739.3001
rbruch@morganlewis.com

Michael J. Puma, Rsq.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5305
Facsimile: 215.963.5001
mpuma@morganlewis.com

_____          _____
    (signature)                              (date) 9/29/2014

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUE...............................................................2

STATEMENT OF THE CASE.................................................................3

     A.    Case History ................................................................3

     B.    Factual Background............................................................4

SUMMARY OF THE ARGUMENT ....................................................27

STANDARD OF REVIEW ...................................................................29

ARGUMENT .........................................................................................30

     I.    TO QUALIFY FOR THE LEARNED PROFESSIONAL
          EXEMPTION, AN EMPLOYEE'S PRIMARY DUTY MUST
          BE THE PERFORMANCE OF WORK REQUIRING
          ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE OR
          LEARNING CUSTOMARILY ACQUIRED BY A
          PROLONGED COURSE OF SPECIALIZED
          INTELLECTUAL INSTRUCTION ..................................................30

     II.    GENEX FAILED TO PROVE BY CLEAR AND
          CONVINCING EVIDENCE THAT WILLIAMS'S PRIMARY
          DUTY WAS THE PERFORMANCE OF WORK REQUIRING
          ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE OR
          LEARNING CUSTOMARILY ACQUIRED BY A
          PROLONGED COURSE OF SPECIALIZED
          INTELLECTUAL INSTRUCTION ..................................................32

i

III.    GENEX FAILED TO PROVE BY CLEAR AND
        CONVINCING EVIDENCE THAT WILLIAMS'S PRIMARY
        DUTY INVOLVES THE PERFORMANCE OF WORK
        REQUIRING HER ADVANCED KNOWLEDGE OF
        NURSING ....................................................................................34

        1.      Plaintiff Williams Does Not Utilize any Advanced
                Knowledge to be a Field Case Manager ...................................40

        2.      GENEX Does Not Require Its Field Case Managers to be
                Registered Nurses ....................................................................43

        3.      Williams is Closely Supervised and her Work Product is
                Reviewed ...................................................................................47

CONCLUSION ........................................................................................48

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arnold v. Ben Kanowsky, Inc.*,
    361 U.S. 392 (1960)............................................................................30

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................27, 29

*Auer v. Robbins*,
    519 U.S. 462 (1997)............................................................................30

*Bothell v. Phase Metrics, Inc.*,
    299 F.3d 1120 (9th Cir. 2002) .........................................................30

*Clark v. J.M. Benson Co.*,
    789 F.2d 282 (4th Cir. 1986) ...........................................................27

*Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*,
    276 F.3d 187 (4th Cir. 2002) ...........................................................29

*Cook v. Carestar*,
    No. 2:11-CV-00691 2013, 2013 WL 5477148 (S.D.O.H. 2013)......37, 39, 40

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)............................................................................30

*Drubetskoy v. Wells Fargo Bank, N.A.*,
    No. CCB-13-2196, 2013 WL 6839508 (D. Md. Dec. 20, 2013).....................2

*Fife v. Harmon*,
    171 F.3d 1173 (8th Cir. 1999) .........................................................46

*Icicle Seafoods, Inc. v. Worthington*,
    475 U.S. 709 (1986)............................................................................42

*In Re Coleman*,
    426 F.3d 719 (4th Cir. 2005) ........................................................................29

*Johnson v. Wellpoint*,
    No. 1:06-CV-2430-ODE, 2009 WL 8753325 (N.D.G.A. 2009).............37, 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................................29

*Mitchell v. Williams*,
    420 F.2d 67 (8th Cir. 1969) ..........................................................................30

*Powell v. Am. Red Cross*,
    518 F. Supp. 2d 24 (D.D.C. 2007)...............................................................34

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)........................................................................................29

*Rieve v. Coventry Health Care, Inc.*,
    870 F. Supp. 2d 856 (C.D. Cal. 2012) ...................................................35, 36

*Scott v. Harris*,
    550 U.S. 372 (2007)........................................................................................29

*Shockley v. City of Newport News*,
    997 F.2d 18 (4th Cir. 1993) ....................................................................27, 30

*Solis v. Washington*,
    656 F.3d 1079 (9th Cir. 2011) .......................................................................45

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)....................................................................................27

*United States Dep't of Labor v. North Carolina Growers Ass'n*,
    337 F.3d 345 (4th Cir. 2004) .........................................................................31

*Young v. Cooper Cameron Corp.*,
    586 F.3d 201 (2d Cir. 2009) ..........................................................................46

iv

## STATUTES

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

29 U.S.C. §§ 201-219 .....................................................................1, 3

29 U.S.C. § 207(a)(1).........................................................................30

29 U.S.C. § 213(a)(1).....................................................................2, 31

29 U.S.C. § 216(b) ...............................................................................1

Md. Code Lab. & Empl. § 3-401, *et. seq.* ........................................3

Md. Code Ann., Lab. & Empl. § 3-403(1)...........................................2

## <u>RULES</u>

Fed. R. Civ. P. 30(b)(6)...............................................................*passim*

Super. Ct. Civ. R. 56 .........................................................................29

## <u>REGULATIONS</u>

29 C.F.R. § 541.300(a)(2)(i) ............................................................31

29 C.F.R. § 541.301(a)..................................................................31, 32

29 C.F.R. § 541.700 ...........................................................................32

29 C.F.R. § 541.700(a).......................................................................35

29 C.F.R. § 541.700(b) ..........................................................32, 33, 35

Md. Code Regs. 09.12.41.01..............................................................2

Md. Code Regs. 09.12.41.17..............................................................2

## <u>OTHER AUTHORITY</u>

Fair Labor Standards Act of June 25, 1938, Chapter 676,
52 Stat. 1069, 29 U.S.C. 201-19 ...............................................................................3

## **STATEMENT OF JURISDICTION**

The United States District Court for the District of Maryland, Baltimore

Division, ("District Court") had subject matter jurisdiction over this civil action

pursuant to 28 U.S.C. § 1331. The claims arose under the laws of the United

States, specifically the Fair Labor Standards Act of June 25, 1938, Chapter 676, 52

Stat. 1069, 29 U.S.C. §§ 201-219, (FLSA), a law of the United States regulating

interstate commerce, and specifically under the provisions of Section 16 of said

Act, as amended (29 U.S.C. § 216(b)). This Court has jurisdiction pursuant to 28

U.S.C. § 1291 to hear this appeal from the district court's final decision on

September 4, 2014, granting the Appellee's Motion for Summary Judgment. On

September 15, 2014, Appellant timely filed a notice of appeal with the Clerk of the

district court.

## <u>STATEMENT OF THE ISSUE</u>

I.     Whether the district court erred when it failed to view the evidence at summary judgment in the light most favorable to Nancy Williams and to draw justifiable inferences in her favor as the non-moving party when it determined that Williams is exempt from the overtime wage requirements of the Fair Labor Standards Act and the Maryland Wage and Hour Law[1] (MWHL) under the learned professional exemption?

---

[1] "The FLSA, and, by extension, the MWHL, exempt certain employees from the requirements of overtime wages, including employees in a bona fide . . . administrative, or professional capacity." *Drubetskoy v. Wells Fargo Bank, N.A.*, No. CCB-13-2196, 2013 WL 6839508, at *7 (D. Md. Dec. 20, 2013); *see also* 29 U.S.C. § 213(a)(1); Md. Code Ann., Lab. & Empl. § 3-403(1). "Professional capacity" and "administrative capacity" have the same meanings under the regulations governing the MWHL as they do under the FLSA regulations. *See* Md. Code Regs. 09.12.41.01, 09.12.41.17. Thus, an employee who qualifies for the professional or administrative exemption under the FLSA will also qualify for that exemption under the MWHL.

# STATEMENT OF THE CASE

## A.    Case History

Plaintiff-Appellant Nancy Williams's claims arise under the Fair Labor Standards Act of June 25, 1938, Chapter 676, 52 Stat. 1069, 29 U.S.C. §§ 201-19 ("FLSA"), and under the Maryland Wage and Hour Law, Md. Code Lab. & Empl. §§ 3-401, *et seq.* ("MWHL"). Defendant-Appellee GENEX Services, LLC (GENEX) employs Williams as a Field Case Manager, and GENEX compensates Williams and her similarly situated Field Case Manager coworkers on a salaried basis. Williams's suit avers that Williams and her similarly situated Field Case Manager coworkers are misclassified under the FLSA and that they are therefore entitled to overtime compensation when they work in excess of 40 hours in a week.

Williams filed her complaint on July 3, 2013, in the United States District Court for the District of Maryland, Baltimore Division. J.A. at 6. The case was assigned to the Hon. Marvin J. Garbis, and the parties reported to Judge Garbis on August 27, 2013, that for the sake of efficiency discovery would be limited to the issue of whether Williams's job was properly classified as exempt under the FLSA and the MWHL.

The parties conducted written discovery within the agreed upon parameters and took the depositions of Williams and GENEX pursuant to Fed. R. Civ. P. Rule 30(b)(6). Thereafter GENEX filed its motion for summary judgment on Friday,

3

January 10, 2014, and Williams filed her opposition brief on Friday, February 21, 2014. Williams then filed a corrected opposition brief on Monday, February 24, 2014, and GENEX filed its reply brief on March 21, 2014. Thereafter Judge Garbis determined that Williams is exempt from the FLSA's and MWHL's overtime wage requirements under the learned professional exemption and thus granted GENEX's motion for summary judgment on September 4, 2014, after determining that no hearing was necessary.

**B.     Factual Background**

GENEX is the nation's leading provider of integrated managed care services, focused on controlling health costs and reducing disability expenses. GENEX focuses on three business areas: worker's compensation and disability management, medical cost containment, and social security representation. GENEX serves employer groups, insurance and managed care providers, and benefit administrators. Its services include workplace injury management, vocational rehabilitation, catastrophic case management, medical bill auditing, and social security disability claim representation. GENEX employs Field Case Managers to provide these services. GENEX describes the Field Case Manager position as a hands-off position. J.A. at 678; *Id.* at 687. Williams has been

employed as a Field Case Manager since in or about November 2010 through the

present date.[2]

While it is true that Field Case Managers working for GENEX *in Maryland*

are required to be registered nurses, this requirement comes from the State of

Maryland and is not any sort of mandate or requirement that GENEX created. J.A.

at 660-61. GENEX's Job Description *does not* require a Field Case Manager to

have an RN:

---

**REQUIRED MINIMUM QUALIFICATIONS:**

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

• EDUCATION: Diploma, Associate or bachelors degree in nursing or bachelors degree (or higher) in a health or human services related field required. Masters level and/or advanced study in a health-related field desired.

• EXPERIENCE: Minimum of two (2) years full time equivalent of direct clinical care to consumers required. Workers' compensation-related experience preferred. Prior case management experience preferred.

• MINIMUM QUALIFICATIONS: The case manager position requires:
(a) Licensure or certification in a health or human services discipline that allows the professional to conduct an assessment independently as permitted within the scope of practice of the discipline;
(b) Two years full-time equivalent of direct clinical care to the consumer; and
(c) At least one of the following:
(i) Certification as a case manager from the URAC approved list of certifications; or
(ii) A bachelors (or higher) degree in a health or human services related field; or
(iii) A registered nurse (RN) license.

• CERTIFICATES, LICENSES, REGISTRATIONS: Current, valid Licensure or certification in a health or human services discipline that allows the professional to conduct an assessment independently as permitted within the scope of practice of the discipline required. CCM, CDMS, CRC, CRRN, COHN preferred. Pursue Case Manager Certification (CCM, CDMS, CRC, CRRN or COHN)

---

[2]    Williams began her employment at Intracorp a month and a half prior to when GENEX acquired Intracorp in January 2011. The parties agreed, in Williams's deposition, to treat GENEX and Intracorp as the same entity, therefore Williams began her employment in November 2010. J.A. at 611-12.

upon eligibility. Within four (4) years of hire as a case manager, the case manager will possess a URAC recognized certification in case management.  Other state licenses/certifications as required by law. Valid driver's license required.

•        OTHER QUALIFICATIONS: Experience in rehabilitation services industry, vocational/occupational/industrial nursing preferred.  Background in state workers' compensation law and practices desirable. Excellent interpersonal skills and phone manners.  Excellent organizational skills.  Ability to set priorities.  Ability to work independently.  Computer literacy required.

J.A. at 682.

Additionally, GENEX's Rule 30(b)(6) designee confirmed that the RN requirement is based on Maryland law and not GENEX's policy:

    10      Q   Do you know if Ms. Williams in order to be
    11      a medical case manager for GENEX needs to be an RN?
    12      A   I do know for a fact in order for Ms.
    13      Williams to be a medical case manager in Maryland
    14      she needs to be an RN.
    15      Q   Do you know if in Pennsylvania Ms.
    16      Williams needs to be an RN in order to be a GENEX
    17      medical case manager?
    18      A   If Ms. Williams is working on a Maryland
    19      jurisdictional case and that case is in
    20      Pennsylvania, she needs to be an RN, she needs to be
    21      certified by the Maryland worker's comp commission.
    22      She needs to have a WCCM and in order to get a WCCM
    1      you must be an RN. In order to be certified by the
    2      Maryland state commission, you must be an RN and
    3      have a WCCM. And in order to work in any
    4      jurisdictional case, be it in Virginia, be it in
    5      Delaware, be it in Pennsylvania, be it in Iowa, you
    6      must have a WCCM and you must be registered by the
    7      Maryland work comp commission. So if you are
    8      performing a case that Maryland work comp, it

9      doesn't matter where you are, you have to have their
10     blessing and you need an RN for their blessing.

J.A. at 662-63.

A lay person (*i.e.* someone who is not a nurse) could do the work of a Field

Case Manger because GENEX provides Field Case Managers with a host of

templates with which they prepare various reports and letters. J.A. at 630. GENEX

provides Field Case Managers national guidelines and detailed prompts to

demonstrate which case management plan the Field Case Manager should choose

to complete short and long term goals. *Id.* at 677. Field Case Managers perform a

finite set of clerical tasks. *Id.* at 688. These tasks include meeting with clients in

their homes, physician's or therapist's offices and/or work sites; interviewing

clients; reviewing a client's pre-injury and/or pre-illness position; making

appointments with a client's physician or therapist; listening to and reviewing the

physician's or therapists diagnosis; obtaining prescriptions; communicating both

in-person and by telephone with clients, employers, medical providers, attorneys,

insurance carriers and claims adjusters; applying all special instructions required

by individual insurance carriers and referral sources; following all pre-established

and required case management plans; preparing reports and other required

paperwork to document all casework activities; meeting weekly billing

requirements; operating office machines; accessing filing cabinets; and attending

staff meetings, workshops, and/or training programs. J.A. at 688.

7

Based on this job description, individuals who have never taken a nursing class, let alone have a degree, could be employed as a GENEX Field Case Manager. In fact, neither of Williams's supervisors, Andrew Nussdorf and Sophia Harris, are registered nurses. J.A. at 679. However, Nussdorf admitted that he has the requisite qualifications to be a Field Case Manager for GENEX, even though he is not a registered nurse, has no medical training, and is a social worker. J.A. at 762-66.

Williams is required to take continued education courses in order to maintain her credentials as an RN. J.A. at 618-619. However these courses do not aid Williams in her duties and responsibilities as a Field Case Manager. Specifically, Williams has taken courses titled "Alzheimer's Disease and Dementia," "Depression and Suicide: The Facts," and "Understanding Elder Abuse and Mistreatment." *Id.* at 620-622. In her deposition, Williams explains that she enrolled in these courses because the subject matter looked interesting. *See id*. Williams testifies that she has not utilized any information that she learned in these courses in her daily duties and responsibilities as a Field Case Manager. *See id.* at 621. Williams did not enroll in courses because she believed that they would assist her in her daily duties and responsibilities as a Field Case Manager. Williams never even considered taking courses that could be beneficial to her performance at

work, demonstrating that Williams does not need advanced knowledge to perform

successfully as a Field Case Manager. J.A. at 622-23.

As a Field Case Manager, Williams does not use any advance knowledge.

Her main responsibility is to coordinate care between the claimants and their

doctors. *See id.* at 625. Moreover, Williams only works as a liaison between the

claimant and doctor in order to keep the doctor apprised of what physical

requirements the claimant's job entailed. J.A. at 625-26. Williams does not

contribute to the diagnosis or have any say in a claimant's treatment plan. In fact,

Williams must notify claimants immediately upon receiving their claim that, as a

Field Case Managers, she cannot directly or indirectly control cases.

```
14    Q.  So do you play a role in reeling in
15    claimants, so to speak, controlling their
16    expectations and getting them to participate in
17    the treatment that's been recommended?
18    A.  We are explicitly denied any
19    control. We –
20    You know, in all –
21    Even in the introduction letter that
22    we send out to patients, it says that we cannot
1     directly or indirectly control cases. We're
2     not providers. We don't have the ability to
3     decision make on any case. We actually get
4     into a lot of trouble trying to do that.
```

J.A. at 627-28. *See also id.* at 666-67.

The most influence a Field Case Manager has over a claimant's care is to

pass a prescription on from the doctor to a claimant. However, Williams's

9

influence over claimants' care does not go any further than that, mostly Williams

observes and reports back.

```
5    Q.  Well, that's not what it says.
6    We'll look at the letter later. But that's not
7    what it says, actually.
8    But let's just go back to my
9    question, which is: Do you communicate with
10   claimants in part in an effort to get them to
11   participate in the treatment that they've been
12   directed to follow by the doctor?
13   A.  Well, sure. I mean, if the doctor
14   has prescribed physical therapy, it's my job to
15   say:
16   Hey, you know, here's the script.
17   The doctor wants you to have PT.
18   For sure.
19   Q.  And you're monitoring their
20   compliance with that treatment and reporting
21   back to the claims adjuster in an effort to
22   return that client to work as safely and
1    quickly as possible, right?
2    A.  Absolutely. We monitor and report
3    back. We let them know, you know, this is how
4    many times they attended, and this is what they
5    did or didn't do. And we report all of that
6    information to the adjuster.
7    Q.  And you're communicating with the
8    patient about the treatment protocol they
9    should be following?
10   A.  Whatever the doctor has prescribed,
11   I'm supporting that.
```

J.A. at 628-29.

As a Field Case Manager, Williams performs all of her assigned tasks in

strict compliance with established specific procedures and protocols which govern

10

and control every aspect of a GENEX Field Case Manager's work. J.A. at 631-32. Williams's job duties include monitoring a recovery plan controlled by a physician, a claims adjuster, and counsel, and Williams does not have the power to alter that course of treatment. J.A. at 631-32, 687.

Although Williams attends all doctor's visits and monitors a claimant's course of treatment, her only responsibility is to act as an observer. J.A. at 627-28, 666-67. GENEX specifically requires that its Field Case Managers notify claimants that *they do not have an influence over a claimant's course of treatment*. *Id.*

Williams describes her position as a Field Case Manager as nothing more than a scribe relaying information back to the adjustors. J.A. at 631-633. GENEX provides forms and templates for Field Case Managers to fill in with applicable information, and Williams does not even have the opportunity to use independent judgment on what should be included or left out of reports. *Id.* Williams describes her job as merely plugging in the applicable information into the appropriate template which has been provided by GENEX. J.A. at 631-32. Williams does not draft original language in the care plans. J.A. at 634-36. Williams pulls all of the language directly from the medical records as she cannot provide care. *See id.*

Williams performs all of her assigned tasks in strict compliance with established specific procedures and protocols which govern and control every

aspect of her work. At no point is Williams able to make improvements or

recommendations to the course of treatment.

```
18    Q.  What specifically have Andy or GENEX
19    in general communicated to you to suggest that
20    you should not provide appropriate
21    recommendations for care and including
22    alternative treatments?
1     A.  It's –
2     Pardon the phrase. It's splattered
3     all over all of the document that we send to
4     claimants very clearly. Sofia sent me an
5     e-mail within the past three months about the
6     fact that, you know, we don't direct care. We
7     have no role in that. And that in the best
8     illustration of that is the introductory letter
9     that we send to claimants, and it clearly
10    states in there that we do not have the
11    authority to authorize things. We don't.
12    That's not our role. We don't authorize. We
13    don't direct care.
```

J.A. at 654-658.

Moreover, Williams is given account guidelines to follow for each of her

claimants. These guidelines describe in detail what Williams is expected to do, in

what order, and how. J.A. at 651-653.

```
7     Q.  All right. Then in what other way
8     would the account guidelines be used in
9     performing your job?
10    A.  Well, every account is different,
11    and some are –
12    Most are very long and will detail
13    out basically –
14    If they have done a really nice job,
15    a lot of them, basically, say how they want us
```

16    to perform our job. You know, do this and then
17    do this and then –
18    It's all mapped out. You know, and
19    they're very regulated and hence the score card
20    for primarily Sedgwick. But I mean, it's all
21    carefully mapped out on how they're wanting you
22    and expecting the nurse case manager to
1     progress through the work at hand.

J.A. at 651-653.

Williams reports directly to Andrew Nussdorf, the Branch Manager of

GENEX's Elkridge office. Williams is also supervised by Sophia Harris. Both

Nussdorf and Harris review Williams's reports and track her hours. J.A. at 672,

679. As part of their roles as supervisors, Nussdorf and Harris regularly receive

calls from Field Case Managers who have questions regarding a particular claimant

or issue. J.A. at 672. Neither Nussdorf nor Harris are registered nurses, however

they are tasked with supervising a position that GENEX now claims requires the

advanced knowledge of a registered nurse. J.A. at 672, 675, 679. Harris's only

qualification for her position is that she was a case manager for approximately

fifteen years and has a Master's degree in rehabilitation. J.A. at 679.This

demonstrates that while GENEX now claims that its Field Case Managers must be

registered nurses because of the type of advanced knowledge the job requires, it

does not require this credential for the supervisors for these Field Case Managers.

13

Williams's reports are reviewed by Harris. J.A. at 679-80. When Harris is reviewing a report by Williams, Harris has final say as to what will be included and where there are problem areas within the course of treatment. J.A. at 679-80. If Harris is confused by something that Williams includes in her report, she can follow up with Williams, however Williams's knowledge does not trump Harris's position. J.A. at 679-80.

GENEX performs random audits to maintain its certification by an organization called Utilization Review and Accreditation Committee ("URAC"). These audits are random and not every claimant's case is audited every month. J.A. at 668-676. These audits are performed by the supervisors, Andrew Nussdorf and Sophia Harris. *Id.* at 669. The audit is essentially an assessment of the work that the Field Case Manager has performed on that file for that claimant. J.A. at 76.

This audit system further demonstrates the direct supervision to which Williams is subject. These audits analyze the way a Field Case Manager has documented the short and long term goals, addressed medical safety and reconciliation, negotiated a claimant's return to work, recorded medications, and many other categories of data. J.A. at 687. In short, Williams is constantly supervised and has no authority individually to manage her caseload.

GENEX has a Case Manager Premium Compensation Program available and any Field Case Manager who would like to participate is automatically eligible.

J.A. at 665. The Compensation Program provides Field Case Managers a bonus additional to their base salary for meeting certain prerequisites. Field Case Managers must be full time salaried employees, they must exceed the monthly billable and invoiced hours, and they must demonstrate compliance with recording and meet management and quality standards. J.A. at 692.

However, time not billable to the claimant does not contribute to the target for the compensation program. Williams's time that was not compensable by the claimant was usually zeroed out on her timecard.

```
18    Q.  Sure. You said you weren't paid for
19    that time. Is what you're saying that it
20    wasn't treated as billable time to the client,
21    and therefore it didn't count towards your
22    target for incentive compensation?
1     A.  Well, what I'm saying is that the
2     two hours that –
3     I entered 2.5 hours, which is how
4     much time I actually waited for the doctor to
5     visit with him and the claimant, and so I
6     entered my time honestly on my time sheets, and
7     they were just basically zeroed out.
```

J.A. at 603-04.

Williams further explains that GENEX does not provide compensation for administrative time. J.A. at 605-06. At the end of every month, GENEX decreases Williams's billable hours, which prevents her from meeting the Compensation Program's billable hours threshold. *Id*.

As part of her job as a Field Case Manager, Williams spends numerous hours on administrative tasks that are necessary to her job. Moreover, Williams spends hours in her car driving to and from claimant's homes and doctor's appointments. Williams does not receive credit for billing time, computer time, and time spent on other administrative tasks such as reviewing emails relating to cases. J.A. at 664.

The following is a chart provided to the district court at J.A. 578-586, supplying it with Williams's assertions of fact juxtaposed to the assertions made by GENEX in support of its motion and contained in its memorandum:

| PLAINTIFF'S ASSERTED FACTS | GENEX'S ASSERTED FACTS |
|---|---|
| 1. Williams describes her position as a Field Case Manager as nothing more than a scribe relaying information back to the adjustors, and as an observer. She has no influence over a claimant's course of treatment. J.A. at 627-28, 631, 666-67. | 1. Plaintiff describes herself as a "case manager," "life care planner" and expert witness" who "assesses[] patient needs, design[s] research-driven life care plans, and coordinat[es] delivery of care. J.A. at 97-98. |
| 2. Williams scribes medical records into forms created by GENEX. She provides no input into a claimant's course of treatment because she is prohibited to do so by GENEX. Moreover, she does not engage in any independent analysis of a claimant's injuries or course of treatment. J.A. at 627-28, 630-31, 666-67. | 2. As an FMCM, Plaintiff engages in medical record reviews, extensive client interviews, collaboration with the medical treatment team, and research to "project current and long-term medical needs and their economic impact." J.A. at 98. |

16

| | |
|---|---|
| 3. Williams works only as a liaison between the employer and doctor in order to keep the doctor apprised of what physical requirements the claimant's job entailed. J.A. at 625-26. | 3. GENEX's field case management services are important to its customers because, among other reasons, the services help them with personnel management by facilitating an injured worker's return to work. J.A. at 98-9. |
| 4. Williams's main responsibility is to coordinate care between the claimants and their doctors. Moreover, Williams only works as a liaison between the employer and doctor in order to keep the doctor apprised of what physical requirements the claimant's job entailed. Williams does not contribute to the diagnosis or have any say in a claimant's treatment plan. In fact, Williams must notify claimants immediately upon receiving their claim that, as a Field Case Managers, she cannot directly or indirectly control cases. J.A. at 625-26, 627-28, 666-67. | 4. GENEX's customers do not pay for Plaintiff to provide or authorize medical treatment or make insurance adjustment decisions for workers' compensation claims. Rather, they pay for Plaintiff to provide them with medical case management services that include assessing a plan of care, evaluating alternatives, and setting short- and long-term goals to help an injured employee turn to work in a timely manner. J.A. at 99. |
| 5. Williams must notify claimants immediately upon receiving their claim that, as a Field Case Manager, she cannot directly or indirectly control cases. J.A. at 627-28, 666-67. | 5. GENEX's clients expect FMCMs to serve as consultants and to provide them with medical expertise that the client's claims adjustors or other employees handling these cases do not have. J.A. at 99. |
| 6. GENEX forbids Field Case Managers from having any control, direct or indirect, in cases. J.A. at 627-28, 666-67. | 6. GENEX's clients "find value in having a FMCM who is a registered nurse be able to analyze the case, meet with the |

17

| | |
|---|---|
| | injured worker and physicians so they can directly ask questions and observe what is happening, and make recommendations regarding treatment options and affirm that the prescribed treatments are appropriate." J.A. at 99. |
| 7. GENEX's Field Case Manager Job Description does not require Field Case Managers to have an RN. J.A. at 687, 662-63. | 7. FMCMs like Plaintiff "are required to have appropriate licensures and certifications *as dictated by state and federal regulations* and URAC and to keep such licensures and certifications renewed and in good standing during their employment with GENEX. J.A. at 100. |
| 8. Williams does not use her nursing degree or associated accreditations in her job duties and responsibilities. Williams did not acquire her degree or accreditations to assist with her current employment at GENEX, all her accreditations were obtained for reasons independent of her current employment. J.A. at 613, 615-17. | 8. In addition to the above qualifications, Plaintiff also has numerous professional certifications, including being a Certified Life Care Planner ("CLCP"); a Certified Disability Management Specialist ("CDMS"); a Certified Case Manager ("CCM"); and a Medicare Set-Aside Consultant Certified ("MSCC"). Although these additional credentials are not required to be an FMCM, Plaintiff certainly views them as pertinent to her job duties. J.A. at 101-2. |

| | |
|---|---|
| 9. Williams is required to take continued education courses in order to maintain her credentials, not because GENEX requires it. J.A. at 618-19. | 9. GENEX also required Plaintiff to take certain continuing education courses that are relevant to her job, such as courses on "Narcotics Medication Safety," "Catastrophic Case Management," and "Ethical Foundations of Healthcare and Counseling, Responsibilities and Decision Making." J.A. at 102. |
| 10. Williams's main responsibility is to coordinate care between the claimants and their doctors. Moreover, Williams only works as a liaison between the employer and doctor in order to keep the doctor apprised of what physical requirements the claimant's job entailed. Williams does not contribute to the diagnosis or have any say in a claimant's treatment plan. In fact, Williams must notify claimants immediately upon receiving their claim that, as a Field Case Managers, she cannot directly or indirectly control cases. J.A. at 625-28, 666-67. | 10. The purpose of Plaintiff's job as an FMCM is to assist persons in returning to work by determining "what is needed to enable a person to move from point A being injured to point B returning to work and coordinating and facilitating that process as long as the goal is to return to work." J.A. at 103. |

| | |
|---|---|
| 11. Williams does not analyze medical information. Instead of providing analysis, Williams copies Wikipedia information into her reports. Even if Williams does not believe treatment is headed in the proper direction, she would not share that information. J.A. at 645-48. | 11. FMCMs, like Plaintiff, "are hired as consultants to the insurance industry so it's important for [FMCMs] to be able to analyze, interpret medical reports, analyze what is going on in a file, and to reach a conclusion as to whether or not it's going in the right direction . . . [and] provide that opinion to the referral source." J.A. at 103-4. |
| 12. Williams is a representative for the insurance companies. The only time Williams recommends a change in treatment to doctors is if she is specifically told to do so by the insurance company. Moreover, the insurance company dictates exactly how the treatment should be changed, Williams provides no independent analysis. J.A. at 623-24. | 12. For each case, Plaintiff generally will assess the injured worker's medical condition and treatments in an effort to understand the case and to look for opportunities to maximize cost containment and minimize an injured worker's time away from work. J.A. at 104. |
| 13. Williams scribes medical records into forms created by GENEX. She provides no input into a claimant's course of treatment because she is prohibited to do so by GENEX. Moreover, she does not engage in any independent analysis of a claimant's injuries or course of treatment. If claims adjusters require more information, Williams will cut and paste information from Wikipedia and send it to them. J.A. at 627-28, 631, 666-67. | 13. In performing these assessments, Plaintiff interviews the injured worker and analyzes and reviews the worker's pertinent medical information, including medical history, current status, diagnosis, prognosis, and current treatment plan. J.A. at 104. |

20

| | |
|---|---|
| 14. If claims adjustors or claimants require more information or a better understanding, Williams will provide them with information pulled directly from Wikipedia. J.A. at 638, 645. | 14. Plaintiff then serves as a consultant to educate injured workers and insurance claims adjustors regarding the injured worker's injuries and treatments. See Pl's Dep. at 57:15-58:3, 185:17-186:9, 210:3-6 (stating that she provides medical information regarding the injured worker to the insurance companies and will explain medical information to the claims adjustors to help them better understand a diagnosis. J.A. at 105. |
| 15. The claimant was also under the impression that stress was causing the pain, demonstrating that Williams did not need her medical knowledge to reach that conclusion. Moreover, Williams directed the claimant to a physical therapist for an actual medical opinion. J.A. at 705. | 15. Plaintiff used her medical knowledge to respond that stress might be causing the pain and recommended that the injured worker contact his physical therapist. J.A. at 106. |
| 16. Williams will communicate with claims adjusters and tell them the course of treatment that has been ordered. If the claims adjuster and doctors have differing opinions, Williams does not offer any recommendations. Williams will provide possible alternative treatment for education and information purposes only. J.A. at 637, 645. | 16. Plaintiff does, however, analyze whether the physician-prescribed treatment is appropriate and provides recommendations as needed for alternative forms of treatment. J.A. at 106. |

| | |
|---|---|
| 17. Williams observed that claimant looked confused and overwhelmed, which does not require medical knowledge. Moreover, Williams only *cautioned* the claimant, she did not change the medical course of treatment or oppose the doctor who cleared the claimant for driving. J.A. at 708. | 17. Plaintiff also cautioned this individual about driving because Plaintiff used her medical judgment to conclude that "he looked glossed over-somewhat confused and clearly overwhelmed." J.A. at 107. |
| 18. Williams suggested this examination so that it could better aid the doctor diagnosing the claimant. Additionally, often the doctor is the one who requests this test and Williams simply relays that request to the claims adjustor. J.A. at 640-41. | 18. As another example, Plaintiff recommended that an injured worker receive an independent medical evaluation to help clarify the diagnosis and treatment plan. J.A. at 107. |
| 19. Williams did not determine that the claimant had a remarkable complication. She was only expressing her feelings towards his discharge while he had the complication. This was not a recommendation to alter treatment. J.A. at 641-42. | 19. Plaintiff also recommended that another injured worker not be discharged from the hospital "when he had a remarkable complication" and Plaintiff's judgment was that discharge would "impose additional risk and turmoil onto the already troubling situation and family." J.A. at 107. |
| 20. Williams will provide possible alternative treatment for education and information purposes only, not in an attempt to alter treatment. J.A. at 637. | 20. Although her recommendations are not always adopted, Plaintiff admits that they are influential. J.A. at 107. |

| | |
|---|---|
| 21. Williams scribes medical records into forms created by GENEX. She provides no input into a claimant's course of treatment because she is prohibited to do so by GENEX. Moreover, she does not engage in any independent analysis of a claimant's injuries or course of treatment. If claims adjusters require more information, Williams will cut and paste information from Wikipedia and send it to them. J.A. at 627-28, 630-31, 666-67. | 21. In addition to conducting an ongoing assessment of an injured worker's condition and medical treatment, Plaintiff also is responsible for developing an individualized care plan that will assist the injured worker in returning to work in a timely and safe manner. J.A. at 108. |
| 22. Williams's main responsibility is to coordinate care between the claimants and their doctors. Moreover, Williams only works as a liaison between the employer and doctor in order to keep the doctor apprised of what physical requirements the claimant's job entailed. Williams does not contribute to the diagnosis or have any say in a claimant's treatment plan. In fact, Williams must notify claimants immediately upon receiving their claim that, as a Field Case Managers, she cannot directly or indirectly control cases. J.A. at 625-28, 666-67. | 22. Although GENEX's clients desire to have information provided to them in a consistent **format**, the **substance** of each care plan that Plaintiff develops is tailored to the injured worker's individual needs and medical conditions. J.A. at 108. |
| 23. Williams scribes medical records into forms created by GENEX. She provides no input into a claimant's course of treatment because she is prohibited to do so by GENEX. Moreover, she does | 23. In developing care plans, Plaintiff may perform research on an injured worker's condition and analyze whether the existing and planned medical treatments are consistent with clinical criteria |

23

| | |
|---|---|
| not engage in any independent analysis of a claimant's injuries or course of treatment. J.A. at 627-28, 630-31, 666-67. | and treatment guidelines for the injured worker's condition. J.A. at 110. |
| 24. Williams is regularly confused about the information in medical records. She consults Wikipedia to understand what the doctors have written. J.A. at 643-44. | 24. In developing care plans and making recommendations to GENEX's clients regarding an injured worker's ongoing medical treatment, Plaintiff admits she is "using either known medical knowledge, or I've gone and done some research to provide to them to help educate them." J.A. at 111. |
| 25. Williams will relay messages between the doctor and claimant. For example, Williams will be handed a physical therapy prescription by the doctor and she will turn around and hand that to the claimant and tell the claimant that the doctor wants him to go and see a physical therapist. J.A. at 628-29. | 25. If Plaintiff determines that an injured worker is not following his/her treatment or care plan, she will work with the injured worker in an effort to get the injured worker to follow the plan so the worker can return to work as quickly as possible. J.A. at 113. |
| 26. Williams finds out from the employer what the claimant's job description entails and reports that directly to the doctor. J.A. at 625-26. | 26. For example, as an FMCM, Plaintiff provides information and input regarding the physical requirements of an injured worker's job and whether the injured worker is physically able to perform the job. J.A. at 113. |

| | |
|---|---|
| 27. Williams rarely uses the secretary. Additionally this secretary is available to all the Field Case Managers and not only at Williams's disposal. J.A. at 606-08. | 27. Plaintiff, however, can utilize an administrative assistant in a GENEX's Elkridge office to help her with processing letters, faxes, and answering the phone. J.A. at 116. |
| 28. As part of their roles as supervisors, Nussdorf and Harris regularly receive calls from Field Case Managers who have questions regarding a particular claimant or issue. J.A. at 672. | 28. With regard to interactions with her supervisors, it has been more than two years since Plaintiff last saw Andy Nussdorf and more than a year and a half since she last saw Sophia Harris. J.A. at 116. |
| 29. Williams's reports are reviewed by Harris. When Harris is reviewing a report by Williams, Harris has final say as to what will be included and where there are problem areas within the course of treatment. J.A. at 624-25. | 29. To the extent that Plaintiff's supervisors edit the care plans and reports that Plaintiff prepares for GENEX's clients, the editing is minimal. J.A. at 116. |
| 30. Williams refers to specific GENEX documents that outline a client's specific guideline. Additionally, Williams will refer to client documents. She does this because GENEX mandates her to. J.A. at 649-50. | 30. Consistent with her substantial independence, Plaintiff stated that in performing her duties, she does not rely on any handbooks or guidelines provided by GENEX. J.A. at 117. |
| 31. While Williams does not take every word of the doctor's notes and the medical record, she cuts the pertinent information verbatim and pastes that into her report. J.A. at 635-36. | 31. Moreover, when using templates, Plaintiff still provides her own recommendations and is not to merely repeat the information that the physician or therapist provides. J.A. at 117-18. |

| | |
|---|---|
| 32. Williams does not analyze medical information. Instead of providing analysis, Williams copies Wikipedia information into her reports. Even if Williams does not believe treatement is headed in the proper direction, she would not share that information. J.A. at 645-48. | 32. Additionally, even when using a template, in order to produce informative and comprehensive case management reports and to communicate about the cases with GENEX's clients, Plaintiff needs to use her medical knowledge to "communicate what's going on effectively and knowledgeably." J.A. at 118. |
| 33. GENEX provides forms and templates for Field Case Managers to fill in with applicable information. Williams describes her job as plugging in the applicable information into the appropriate template which has been provided by GENEX. Williams does not contribute to the diagnosis or have any say in a claimant's treatment plan. J.A. at 627-28, 631-33, 666-67. | 33. Consistent with being a consultant, Plaintiff analyzes medical information and then, based on her analysis, makes recommendations and takes action in an effort to achieve a desirable outcome for the client. J.A. at 119. |

## SUMMARY OF THE ARGUMENT

GENEX filed its motion for summary judgment on the issue of whether Williams was properly classified as an exempt employee under the FLSA, an issue on which it has the burden of proof, as "[e]mployers must prove by clear and convincing evidence that an employee qualifies for exemption." *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993) (citing *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir. 1986)). Accordingly, in order to enter summary judgment in favor of GENEX the district court weighed the evidence and reached factual inferences contrary to Williams, thus falling afoul of the holding in *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014),[3] which affirmed that it is reversible error when a court "fail[] to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

---

[3] Specifically, the *Tolan* Court noted that:

> By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

Specifically, the district court determined GENEX proved by clear and convincing evidence that Williams qualifies to be classified as exempt under the FLSA under the learned professional exemption. In so holding, the district court interpreted ambiguous evidence proffered by GENEX in GENEX's favor as the movant, and dismissed as "self-serving opinion testimony" Williams's deposition testimony in which she described the work she actually performed on a daily basis. For these reasons this Court should reverse the district court's grant of summary judgment and remand the case for adjudication.

## STANDARD OF REVIEW

On appeal, the district court's decisions on matters of law and statutory interpretation are subject to *de novo* review. *In Re Coleman*, 426 F.3d 719, 724 (4th Cir. 2005); *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002) (finding that appellate courts apply *de novo* standard where entry of judgment raises legal questions regarding proper statutory interpretation).

Rule 56 states that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56. A genuine issue for trial exists unless a rational fact finder could not find in favor of the nonmoving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In making this determination, a court may not assess the credibility of any witness, weigh the evidence, or seek to find the truth of the matter, as its role is only to determine if a genuine issue exists for trial. *See Anderson*, 477 U.S. at 249. If there is a dispute as to a material fact, the fact must be viewed in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 586; *Scott v. Harris*, 550 U.S. 372, 380 (2007). And to that end, a genuine issue of material fact should defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48.

# ARGUMENT

## I.  TO QUALIFY FOR THE LEARNED PROFESSIONAL EXEMPTION, AN EMPLOYEE'S PRIMARY DUTY MUST BE THE PERFORMANCE OF WORK REQUIRING ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE OR LEARNING CUSTOMARILY ACQUIRED BY A PROLONGED COURSE OF SPECIALIZED INTELLECTUAL INSTRUCTION

The FLSA requires that employers pay overtime compensation for all hours worked in excess of forty hours in a week unless a particular exemption applies. 29 U.S.C. § 207(a)(1). "FLSA exemptions are to be 'narrowly construed against ... employers' and are to be withheld except as to persons 'plainly and unmistakably within their terms and spirit.'" *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

An employer who claims an exemption from the FLSA bears the burden of demonstrating that such an exemption applies. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993). "The criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) (quoting *Mitchell v. Williams*, 420 F.2d 67, 69 (8th Cir. 1969)) (quotation marks omitted). Exemptions from, or exceptions to, requirements of the FLSA are to be narrowly construed against the

30

employer asserting them. *See*, *e.g.*, *United States Dep't of Labor v. North Carolina Growers Ass'n*, 337 F.3d 345, 350 (4th Cir. 2004).

The FLSA includes an exemption from the overtime requirement for "any employee employed in a bona fide executive, administrative, or professional capacity...." 29 U.S.C. § 213(a)(1). Under DOL regulations, the term "employee employed in a bona fide professional capacity" means an employee whose primary duties require "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i). The section entitled "Learned Professionals" provides that:

> (a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:
>
> > (1) The employee must perform work requiring advanced knowledge;
> >
> > (2) The advanced knowledge must be in a field of science or learning; and
> >
> > (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a) ("learned professional exemption").

To satisfy the "primary duty" test for the learned professional exemption, the law requires GENEX to establish that Williams:

31

1.     "perform[ed] work requiring advanced knowledge;"

2.     "in a field of science or learning;"

3.     that is "customarily acquired by a prolonged course of specialized

intellectual instruction."

29 C.F.R. § 541.301(a).

## II.     GENEX FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT WILLIAMS'S PRIMARY DUTY WAS THE PERFORMANCE OF WORK REQUIRING ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE OR LEARNING CUSTOMARILY ACQUIRED BY A PROLONGED COURSE OF SPECIALIZED INTELLECTUAL INSTRUCTION

29 C.F.R. § 541.700 defines primary duty, and subsection (b) mandates that:

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

In holding that GENEX proved by clear and convincing evidence that

Williams's primary duty was the performance of work requiring advanced

knowledge in a field of science or learning such that she was exempt under the

learned professional exemption, the district court explained:

32

Further, Nussdorf testified that no more than 10 percent of the time Williams spends working on a case is spent writing evaluation reports. The other 90 percent of the time is spent on a variety of tasks that include meeting and communicating with the doctors, physical therapists, and/or injured employee. See Nussdorf Dep. 93:12-94:10. Thus, even assuming that report writing is the action of a "mere scribe," such a task takes up only 10 percent of Williams's time, which is not sufficient to have the alleged clerical work qualify as Williams's primary duty. See 29 C.F.R. § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.").

J.A. at 79.

However, Nussdorf's deposition actually states as follows:

93:9  Q   So would it be fair to say a large
10      percentage of her caseload is worker's comp?
11      A   It would be fair to say that.
12      Q   On the worker's comp, how much of her time
13      relative to the other things she does on the file
14      would be spent preparing reports? Would it be 10
15      percent of the time, 20 percent of the time as a
16      roughly ball park, something like that?
17      A   I would say she averages somewhere in the
18      neighborhood of 8 to 10 hours a case and preparing
19      the report is half an hour or so. I would say less
20      than 10 percent I would say.
21      Q   What would the other roughly 90 percent of
22      the time on a case be spent doing?
94:1  A   Could be spent meeting with the doctor,
2      could be spent meeting with the physical therapist,
3      could be spent meeting with the injured worker,
4      could be spent communicating with the injured worker
5      via phone, via e-mail, could be communicating with
6      the physicians or physical therapists via phone or
7      e-mail, could be spent in writing a letter to the

33

8      doctor, to the claimant, to the physical therapist,
9      could be spent communicating with the adjustor,
10     could be spent in research.
11     Q  Could it also be spent in transit?
12     A  Could be spent in driving.

J.A. at 172-73.

The district court's interpretation of GENEX's corporate representative's

rank speculation simply does not qualify as clear and convincing evidence that

would support the holding that Williams spent more than 50 percent of her time

performing exempt work in order to satisfy the primary duty requirement.

## III.  GENEX FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT WILLIAMS'S PRIMARY DUTY INVOLVES THE PERFORMANCE OF WORK REQUIRING HER ADVANCED KNOWLEDGE OF NURSING

The district court succinctly identified the issue below when it observed that

in order to prevail on its motion for summary judgment, the law requires GENEX

to establish that Williams's primary duty involves the performance of work

requiring her advanced knowledge of nursing. As the United States District Court

for the District of Columbia has stated:

> Although the Court is unaware of any case in which a registered nurse
> has been found not to satisfy the primary duty test, the [presumptive
> exemption for registered nurses] is not necessarily dispositive of the
> first element of that test, *i.e.*, whether a particular nursing position has
> as its primary duty the performance of work requiring advanced
> knowledge.

*Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 39 (D.D.C. 2007).

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

"[W]ork requiring advanced knowledge" is defined as:

> work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. . . . .

29 C.F.R. § 541.700(b).

The district court declared that "Williams's duties as an FMCM for GENEX are almost identical to those of the plaintiff in *Rieve*," citing to *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856 (C.D. Cal. 2012). J.A. at 73. The court then declared:

Williams concedes in her Response to GENEX's Motion that her job tasks include:

> meeting with clients in their homes, physician's or therapist's offices and/or work sites; interviewing clients; reviewing a client's pre-injury and/or pre-illness position; making appointments  with a client's physician or therapist; listening to and reviewing the physician's or therapists diagnosis; obtaining prescriptions; communicating both in-person and by telephone with clients, employers, medical providers,

> attorneys, insurance carriers and claims adjusters; applying all special
> instructions required by individual insurance carriers and referral
> sources; following all pre-established and required case management
> plans; preparing reports and other required paperwork to document all
> casework activities; meeting weekly billing requirements; operating
> office machines; accessing filing cabinets; and attending staff
> meetings, workshops, and/or training programs.
>
> Document 20] at 8-9 (emphasis added). Seeking to create a factual
> issue, Williams labels these duties as "a finite set of clerical tasks." *Id*.
> at 8. However, this is insufficient to avoid summary judgment when
> there is no genuine issue of material fact as to the <u>substance</u> of
> Williams's duties as an FMCM. *Cf. Rieve*, 870 F. Supp. 2d at 859-60,
> 865-66.
>
> …
>
> "This Court is not aware of any case, nor do[es Williams] cite to any
> case, in which a case manager or a registered nurse in any position has
> not been deemed a professional exempt from FLSA coverage." *Rieve*,
> 870 F. Supp. 2d at 864.

J.A. at 73-4.

However, in *Rieve*, the plaintiff testified that she spent the majority of her

time speaking with care providers to understand the patient's conditions, evaluated

whether the care being provided was appropriate, offered alternatives to current

treatment, and synthesized medical status and work. *Rieve*, 870 F. Supp. 2d at 860.

In the matter before the Court, Williams never characterized her responsibilities as

similar to the foregoing. Instead, Williams testified that she only works as a liaison

between the employer and doctor in order to keep the doctor apprised of what

physical requirements the claimant's job entails. J.A. at 625-26. Williams does not

36

contribute to the diagnosis or have any say in a claimant's treatment plan. In fact, Williams is required, by GENEX, to notify claimants immediately upon receiving their claim that, as a Field Case Manager, she cannot directly or indirectly control cases. J.A. at 627-28, 666-67. The most influence a Field Case Manager has over a claimant's care, is to pass a prescription on from the doctor to the claimant. J.A. at 628-29. Although Williams attends doctor's visits and monitors a claimant's course of treatment, her only responsibility is to act as an observer. J.A. at 627-28, 666-67.

Moreover, in *Johnson v. Wellpoint*, No. 1:06-CV-2430-ODE, 2009 WL 8753325 (N.D.G.A. 2009), and *Cook v. Carestar*, 2013 WL 5477148 (S.D.O.H. 2013), the district courts looked at identical circumstances and said the issue was a fact question. In *Johnson*, the court found that there was a genuine issue of material fact as to whether plaintiffs' primary duties could be considered exempt work because the parties provided contrasting testimony. Plaintiffs were Medical Management Nurses and Nurse Case Managers who assisted in the management of health care coverage provided to patients through defendant's insurance products. *Johnson*, 2009 WL8753325 at *2. Like Williams, most of the plaintiffs were registered nurses. *Id.* Each plaintiff testified that in their day-to-day duties they had little discretion and no authority to override the guidelines provided to them by the defendant. *Id.* at *17. Conversely, plaintiffs' supervisors all testified that plaintiffs

37

were required to use their knowledge, discretion, and judgment as nurses to successfully fulfill the duties of their positions. *Id.* Due to this conflicting testimony, the court was unable to determine what plaintiffs' primary duties were, and therefore found a genuine issue of material fact. *Id.* at \*19. However, the *Johnson* Court determined that if plaintiffs were not required to "use any discretion or judgment in inputting this information, but instead merely typed what providers told them, then it is possible that Plaintiffs do not meet the 'primary duty' test for exemption. *Id.*

Williams testified that her position as a Field Case Manager is nothing more than a scribe relaying information back to the adjustors. J.A. at 631. Moreover, Williams testified that she cannot make any adjustments to treatments, and must follow the guidelines provided to her by GENEX. J.A. at 651-53, 654-58. GENEX argues that no more than 10 percent of the time Williams spends working on a case is spent writing evaluation reports. The other 90 percent of the time is spent on a variety of tasks that include meeting and communicating with the doctors, physical therapists, and/or injured employees. J.A. at 173-74. While the district court adopted the description of Williams's duties as enumerated by GENEX, the testimony provided by Williams is in direct contrast with the evidence that GENEX puts forth, thus an identical issue of material fact is created in this case as the one in *Johnson*.

In *Cook*, the court determined that there was a genuine issue of material fact because if plaintiffs' primary duties only required general case management knowledge acquired through the defendant's in-house training sessions and on the job training, then plaintiffs' education is not enough to satisfy the "primary duty" requirement of the "learned professional" exemption. *Cook*, 2013 WL 5477148 at *8. In other words, the court required proof that the plaintiffs used their education, and did not merely possess it. The plaintiffs in *Cook* were, similar to Williams, case managers whose duties included developing and implementing medical care plans and evaluating the appropriateness of treatment to clients. *Id.* at *1. The job description for this position did not require any specific level of education or any specific discipline of study. *Id.* at *2. However, the state required that all case managers be registered nurses, even though plaintiffs were not working as nurses. *Id*. at *8. To determine if plaintiffs were exempt under the learned professional exemption of FLSA, the court needed to examine the actual duties and responsibilities of plaintiffs' positions. *Id.* The parties submitted conflicting duties and responsibilities in their briefs, and the court was unable to make a determination because, "it is not the role of the trial court to resolve disputes by weighing the conflicting evidence–that is the job for the jury." *Cook*, 2013 WL 5477148 at *9.

Similar to *Cook*, Field Case Managers working for GENEX *in Maryland* are required to be registered nurses. However, this requirement comes from the State of Maryland and is not any sort of mandate or requirement that GENEX created. J.A. at 660-61. GENEX's Job Description *does not* require a Field Case Manager to have an RN. *Id.* at 687. Though Williams is a registered nurse, the Court must focus on whether Williams uses her education in order to successfully complete her job duties and responsibilities. *Cook*, 2013 WL 5477148 at *8. Williams proffers that she does not use her degree as a registered nurse and instead only uses skills learned through GENEX templates and guidelines. J.A. at 630, 677. GENEX submits contrasting information. This conflicting testimony renders it impossible for the district court to make an adequate determination at the summary judgment stage.

**1.    Plaintiff Williams Does Not Utilize any Advanced Knowledge to be a Field Case Manager.**

A lay person (*i.e.*, someone who is not a registered nurse) could do the work of a Field Case Manger because GENEX provides Field Case Managers with a host of templates with which the Field Case Manager prepare various reports and letters. J.A. at 630. GENEX provides Field Case Managers national guidelines and detailed prompts to demonstrate which case management plan the Field Case Manager should choose to complete short and long term goals. J.A. at 677. Field Case Managers perform a finite set of clerical tasks. J.A. at 687. These tasks

40

include meeting with clients in their homes, physician's or therapist's offices and/or work sites; interviewing clients; reviewing a client's pre-injury and/or pre-illness position; making appointments with a client's physician or therapist; listening to and reviewing the physician's or therapists diagnosis; obtaining prescriptions; communicating both in-person and by telephone with clients, employers, medical providers, attorneys, insurance carriers and claims adjusters; applying all special instructions required by individual insurance carriers and referral sources; following all pre-established and required case management plans; preparing reports and other required paperwork to document all casework activities; meeting weekly billing requirements; operating office machines; accessing filing cabinets; and attending staff meetings, workshops, and/or training programs. J.A. at 687.

Moreover, Williams's main responsibility is to coordinate care between the claimants and their doctors. J.A. at 625. Williams only works as a liaison between the claimant and doctor in order to keep the doctor apprised of what physical requirements the claimant's job entailed. J.A. at 625-26. Williams does not contribute to a claimant's diagnosis or have any say in a claimant's treatment plan. In fact, GENEX requires that Williams notify claimants immediately upon receiving their claim that, as a Field Case Manager, she cannot directly or indirectly control cases. J.A. at 627-28, 666-67. The most influence a Field Case

41

Manager has into a claimant's care is to pass a prescription on from the doctor to a claimant. *Id.* at 628-29. Although Williams attends all doctor's visits and monitors a claimant's course of treatment, her only responsibility is to act as an observer. J.A. at 627-28, 666-67.

Additionally, Williams does not regularly exercise discretion and independent judgment. Williams performs all of her assigned tasks in strict compliance with established specific procedures and protocols which govern and control every aspect of her work. J.A. at 631-32. GENEX provides forms and templates for Field Case Managers to fill in with applicable information. Id. Williams describes her job as merely plugging in the applicable information into the appropriate template which has been provided by GENEX. *Id.* at 632-33. Williams does not draft any original language in the care plans. J.A. at 634-36. Williams pulls all the language directly from the medical records as she cannot provide care. *See id.* The Supreme Court has noted that the question of how an employee spends her time working – *i.e.*, what she does while at work – "is a question of fact." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Given that Williams presented specific facts showing that her primary duties were not that of a registered nurse, the district court erred in granting summary judgment to GENEX.

## 2.    GENEX Does Not Require Its Field Case Managers to be Registered Nurses.

Field Case Managers working for GENEX in Maryland are required to be registered nurses. J.A. at 666-67. But this requirement comes from the State of Maryland, and is not a mandate GENEX created on its own. J.A. at 660-61.

GENEX's Job Description does not require a Field Case Manager to have an RN:

---

**REQUIRED MINIMUM QUALIFICATIONS:**

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

• EDUCATION: Diploma, Associate or bachelors degree in nursing or bachelors degree (or higher) in a health or human services related field required. Masters level and/or advanced study in a health-related field desired.

• EXPERIENCE: Minimum of two (2) years full time equivalent of direct clinical care to consumers required. Workers' compensation-related experience preferred. Prior case management experience preferred.

• MINIMUM QUALIFICATIONS: The case manager position requires:
(a) Licensure or certification in a health or human services discipline that allows the professional to conduct an assessment independently as permitted within the scope of practice of the discipline;
(b) Two years full-time equivalent of direct clinical care to the consumer; and
(c) At least one of the following:
(i) Certification as a case manager from the URAC approved list of certifications; or
(ii) A bachelors (or higher) degree in a health or human services related field; or
(iii) A registered nurse (RN) license.

• CERTIFICATES, LICENSES, REGISTRATIONS: Current, valid Licensure or certification in a health or human services discipline that allows the professional to conduct an assessment independently as permitted within the scope of practice of the discipline required. CCM, CDMS, CRC, CRRN, COHN preferred. Pursue Case Manager Certification (CCM, CDMS, CRC, CRRN or COHN)

---

upon eligibility. Within four (4) years of hire as a case manager, the case manager will possess a URAC recognized certification in case management.  Other state licenses/certifications as required by law. Valid driver's license required.

•       OTHER QUALIFICATIONS: Experience in rehabilitation services industry, vocational/occupational/industrial nursing preferred.  Background in state workers' compensation law and practices desirable. Excellent interpersonal skills and phone manners.  Excellent organizational skills.  Ability to set priorities.  Ability to work independently.  Computer literacy required.

J.A. at 687. Additionally, GENEX's 30(b)(6) designee confirmed that the RN

requirement is based on Maryland law and not GENEX's policy in his deposition.

J.A. at 662-63.

> The Ninth Circuit has held that:
>
> Whether a position requires a degree in a specialized area, *see Reich*, 993 F.2d at 739, or merely a specific course of study, *see Rutlin*, 220 F.3d at 737, a "prolonged *course of specialized intellectual instruction" must be sufficiently specialized and relate directly to the position. An educational requirement that may be satisfied by degrees in fields as diverse as anthropology, education, criminal justice, and gerontology does not call for a "course of *specialized* intellectual instruction." Moreover, in this case the net is cast even wider by the acceptance of applicants with other degrees as long as they have sufficient coursework in any of these fields.
>
> DSHS nonetheless contends that it has presented evidence that each of the acceptable degrees relates to the duties of its social workers. However, while social workers no doubt have diverse jobs that benefit from a multi-disciplinary background, [Fn. omitted] the "learned professional" exemption applies to positions that require "a prolonged course of *specialized* intellectual instruction," not positions that draw from many varied fields. While particular coursework in each of the acceptable fields may be related to social work, DSHS admits that it does not examine an applicant's coursework once it determines that the applicant's degree is within one of those fields. For the "learned professional" exemption to apply, the knowledge required to perform

the duties of a position must come from "advanced specialized intellectual instruction" rather than practical experience. 29 C.F.R. § 541.301(d). The requirement of a degree or sufficient coursework in any of several fields broadly related to a position suggests that only general academic training is necessary, with the employer relying upon apprenticeship and experience to develop the advanced skills necessary for effective performance as a social worker.

…

As noted previously, FSLA exemptions are construed narrowly against employers and "are to be withheld except as to persons plainly and unmistakably within their terms and spirit," *Klem*, 208 F.3d at 1089, and the employer has the burden of showing that a particular exemption applies, *Bothell*, 299 F.3d at 1124. We conclude that DSHS has not met its burden of showing that its social workers come within the "learned professional" exemption, and that the district court should not have granted summary judgment in its favor. [Fn. omitted]

*Solis v. Washington*, 656 F.3d 1079, 1087-89 (9th Cir. 2011).

Moreover, the Second Circuit has held that:

The regulations state that a professional is someone "[w]hose primary duty consists of the performance of [w]ork requiring knowledge of an advance type in a field of science or learning *customarily acquired by a prolonged course of specialized intellectual instruction and study.*" 29 C.F.R. § 541.3(a)(1) (emphasis added). As noted above, "customarily" in this context makes the exemption applicable to the rare individual who, unlike the vast majority of others in the profession, lacks the formal educational training and degree. But where most or all employees in a particular job lack advanced education and instruction, the exemption is inapplicable: hence, the Secretary's interpretation advising that "members of such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training" are not properly considered exempt professionals. *See* 29 C.F.R. § 541.301(d).

45

> We therefore hold that an employee is not an exempt professional unless his work requires knowledge that is customarily acquired after a prolonged course of specialized, intellectual instruction and study. If a job does *not* require knowledge customarily acquired by an advanced educational degree—as for example when many employees in the position have no more than a high school diploma—then, regardless of the duties performed, the employee is not an exempt professional under the FLSA.

*Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205-06 (2d Cir. 2009) (emphasis in original).

In *Fife v. Harmon*, the minimum qualifications for the plaintiffs' position as Airfield Operation Specialists were "a Bachelor's degree in aviation management or a directly related field, or four years of full-time experience in aviation administration, or an equivalent combination of experience and education." 171 F.3d 1173, 1177 (8th Cir. 1999). The court held the exemption inapplicable: "This is advanced knowledge from a general academic education and from an apprenticeship, not from a prolonged course of specialized intellectual instruction." *Id.* (internal quotation marks omitted). The court did not separately consider the nature of the plaintiffs' duties.

GENEX does not require its Field Case Managers to be registered nurses, demonstrating that the position could be done by someone who is not a registered nurse. Further, based on this job description, individuals who have never taken a nursing class, let alone have a degree could be employed as a GENEX Field Case Manager. In fact, neither of Williams's supervisors, Andrew Nussdorf nor Sophia

46

Harris, are registered nurses. J.A. at 679. Moreover, Nussdorf , testifying as

GENEX's Rule 30(b)(6) corporate deponent, admitted that he has the requisite

qualifications to be hired as a Field Case Manager for GENEX, even though he is

not a registered nurse, has no medical training, and is a trained social worker. J.A.

at 762-766.

### 3.     Williams is Closely Supervised and her Work Product is Reviewed.

Williams does not use independent judgment in her position as a Field Case

Manager. J.A. at 624-25. All of Williams's reports are reviewed by her

supervisors, Andrew Nussdorf and Sophia Harris. Neither Nussdorf nor Harris are

registered nurses, however they are tasked with supervising a position that GENEX

now claims requires the advanced knowledge of a registered nurse. J.A. at 672,

675, 679. Harris's only qualification for her position is that she was a case manager

for approximately fifteen years and has a Master's degree in rehabilitation. J.A. at

679-80. Moreover, Nussdorf has a degree in social work, and is not an RN. J.A. at

762-766. This demonstrates that while GENEX now claims that its Field Case

Managers must be registered nurses because of the type of advanced knowledge

the job requires, GENEX does not require this advanced knowledge for the

supervisors for these Field Case Managers.  Although neither of Williams's

supervisors are registered nurses, they have ultimate authority over what is

included in a report. J.A. at 679-80.

47

Finally, GENEX performs random audits to maintain its certification by an organization called Utilization Review and Accreditation Committee ("URAC"). The audit is essentially an assessment of the work that the Field Case Manager has performed on that file for that claimant. J.A. at 672. Williams is constantly supervised and has no authority individually to manage her caseload.

## **CONCLUSION**

For the foregoing reasons, Williams respectfully requests that the decision of the district court granting GENEX's motion for summary judgment be REVERSED, and that the case be REMANDED for further proceedings. Counsel respectfully requests oral argument on this matter.

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, NW, 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for the Appellant*

# **ADDENDUM**

# TABLE OF CONTENTS

**Page**

Fair Labor Standards Act, 29 U.S.C. § 207(a)...................................................Add. 1

Fair Labor Standards Act, 29 U.S.C. § 213(a)...................................................Add. 1

Fair Labor Standards Act, 29 C.F.R. § 541.3(a)...............................................Add. 4

Fair Labor Standards Act, 29 C.F.R. § 541.300(a) ..........................................Add. 5

Fair Labor Standards Act, 29 C.F.R. § 541.301(a)...........................................Add. 5

Fair Labor Standards Act, 29 C.F.R. § 541.301(d)...........................................Add. 6

Fair Labor Standards Act, 29 C.F.R. § 541.700(a)...........................................Add. 6

Fair Labor Standards Act, 29 C.F.R. § 541.700(b)...........................................Add. 7

Maryland Wage and Hour Law, Md. Code Lab. & Empl. §§ 3-403(1) ...........Add. 7

Maryland Wage and Hour Law, Md. Code Regs. 09.12.41.01 ........................Add. 7

Maryland Wage and Hour Law, Md. Code Regs. 09.12.41.17 ........................Add. 7

# STATUTORY ADDENDUM

**Fair Labor Standards Act, 29 U.S.C. § 207(a)**

(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions

**(1)** Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

**(2)** No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966--
**(A)** for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966,

**(B)** for a workweek longer than forty-two hours during the second year from such date, or

**(C)** for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

**Fair Labor Standards Act, 29 U.S.C. § 213(a)**

(a)      Minimum wage and maximum hour requirements

The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to--

**(1)** any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

**(2)** Repealed. Pub.L. 101-157, § 3(c)(1), Nov. 17, 1989, 103 Stat. 939

**(3)** any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33 ⅓ per centum of its average receipts for the other six months of such year, except that the exemption from sections 206 and 207 of this title provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 206 of this title, a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture; or

**(4)** Repealed. Pub.L. 101-157, § 3(c)(1), Nov. 17, 1989, 103 Stat. 939

**(5)** any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

**(6)** any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor, (B) if such

employee is the parent, spouse, child, or other member of his employer's immediate family, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in agriculture less than thirteen weeks during the preceding calendar year, (D) if such employee (other than an employee described in clause (C) of this subsection) (i) is sixteen years of age or under and is employed as a hand harvest laborer, is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) is employed on the same farm as his parent or person standing in the place of his parent, and (iii) is paid at the same piece rate as employees over age sixteen are paid on the same farm, or (E) if such employee is principally engaged in the range production of livestock; or

**(7)** any employee to the extent that such employee is exempted by regulations, order, or certificate of the Secretary issued under section 214 of this title; or

**(8)** any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

**(9)** Repealed. Pub.L. 93-259, § 23(a)(1), Apr. 8, 1974, 88 Stat. 69

**(10)** any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

**(11)** Repealed. Pub.L. 93-259, § 10(a), Apr. 8, 1974, 88 Stat. 63

**(12)** any employee employed as a seaman on a vessel other than an American vessel; or

**(13), (14)** Repealed. Pub.L. 93-259, §§ 9(b)(1), 23(b)(1), Apr. 8, 1974, 88 Stat. 63, 69

**(15)** any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of

age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

**(16)** a criminal investigator who is paid availability pay under section 5545a of Title 5; or

**(17)** any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--
**(A)** the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

**(B)** the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

**(C)** the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

**(D)** a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.


**Fair Labor Standards Act, 29 C.F.R. § 541.3(a)**

(a) The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair

Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be.

**Fair Labor Standards Act, 29 C.F.R. § 541.300(a)**

(a) The term "employee employed in a bona fide professional capacity" in section 13(a)(1) of the Act shall mean any employee:
(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging, or other facilities; and

(2) Whose primary duty is the performance of work:

(i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or

(ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

**Fair Labor Standards Act, 29 C.F.R. § 541.301(a)**

(a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:
    (1) The employee must perform work requiring advanced knowledge;

    (2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

**Fair Labor Standards Act, 29 C.F.R. § 541.301(d)**

(d) The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

**Fair Labor Standards Act, 29 C.F.R. § 541.700(a)**

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

**Fair Labor Standards Act , 29 C.F.R. § 541.700(b)**

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

**Maryland Wage and Hour Law, Md. Code Lab. & Empl. §§ 3-403(1)**

This subtitle does not apply to an individual who:

(1) is employed in a capacity that the Commissioner defines, by regulation, to be administrative, executive, or professional;

**Maryland Wage and Hour Law, Md. Code Regs. 09.12.41.01**

"Administrative capacity" has the meaning stated in 29 CFR §541.200 et seq.

**Maryland Wage and Hour Law, Md. Code Regs. 09.12.41.17**

"Professional capacity" has the meaning stated in 29 CFR §541.300 et seq.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,002*] words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number
of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].

Dated: October 27, 2014                    /s/ Nicholas Woodfield
                                           *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 27th day of October, 2014 I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Michael J. Puma, Esq.
> Russell R. Bruch, Esq.
> MORGAN, LEWIS & BOCKIUS LLP
> 1111 Pennsylvania Avenue, NW
> Washington, DC  20004
> Telephone: 202.739.3000
> Facsimile: 202.739.3001
> mpuma@morganlewis.com
> rbuch@morganlewis.com
>
> *Counsel for Appellee*

I further certify that on this 27th day of October, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Nicholas Woodfield
*Counsel for Appellant*
