# NO. 14-1966

In The

# United States Court of Appeals

### For the Fourth Circuit

## NANCY A. WILLIAMS, on her own behalf and on behalf of all others similarly situated,

*Plaintiff – Appellant,*

v.

## GENEX SERVICES, LLC, f/k/a GENEX SERVICES, INC.,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## RESPONSE BRIEF OF APPELLEE

Michael J. Puma
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5305

Russell R. Bruch
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202.739.5293

Allyson N. Ho
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Telephone: 214.466.4180

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1966__        Caption: __Nancy Williams v. GENEX Services, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__GENEX Services, LLC__
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☑YES ☐NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
    GENEX Services, LLC is wholly owned by Genex Holdings, Inc. Genex Holdings, Inc. is wholly owned by Gem Parent, Inc. Gem Parent, Inc. is wholly owened by Gem Intermediate, Inc. Gem Intermediate, Inc. is wholly owned by Gem Acquisition, Inc.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _9/29/14_

Counsel for: GENEX Services, LLC

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on _9/29/14_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _9/29/14_
(signature)                              (date)

- 2 -

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUE ..................................................................1

STATEMENT OF THE CASE ..................................................................2

I.    FACTUAL BACKGROUND..............................................................2

    A.    Williams Is Responsible For Ensuring Safe, Quality, Timely And Cost-Effective Care For Injured Workers ...................................2

    B.    Williams Performs Work Directly Related To The Management Or General Business Operations Of GENEX And Its Clients ............3

    C.    GENEX Requires FMCMs Like Williams To Maintain Certain Professional Credentials, And Williams Is One Of GENEX's Most Highly Credentialed Case Managers ..........................................5

    D.    GENEX Paid Williams Over $80,000 Per Year On A Salary Basis .........................................................................................8

    E.    Williams's Duties Include Developing And Administering Care Plans To Facilitate An Injured Worker's Appropriate And Timely Return To Work ....................................................................8

    F.    Williams's Duties Included The Exercise Of Independent Judgment And Discretion ..................................................................20

SUMMARY OF ARGUMENT ........................................................................24

ARGUMENT ...................................................................................................27

I.    STANDARD OF REVIEW ......................................................................27

II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE WILLIAMS IS A LEARNED PROFESSIONAL EXEMPT FROM THE FLSA AS A MATTER OF LAW ..............................................................................................................28

    A.    Williams Does Not Dispute That The Salary Basis Requirement Is Satisfied ........................................................................................29

# **TABLE OF CONTENTS**
### (continued)

**Page**

B.    The Primary Duty Requirement Is Satisfied As A Matter Of Law Because The Record Evidence Conclusively Establishes That Williams's Primary Duty Was To Perform Work Requiring Advanced Knowledge In A Field Of Science Or Learning Acquired By A Prolonged Course Of Specialized Instruction ................................................................................................30

    1.    The Learned Professional's Primary Duties Test Is Satisfied Because Williams's Job Requires Her To Be A Registered Nurse ........................................................................30

    2.    Alternatively, Williams Satisfies The Primary Duties Test Because She Performs Work Requiring Advanced Knowledge ..............................................................................33

C.    The Exercise Of Discretion And Judgment Element Is Satisfied As A Matter Of Law .................................................................42

CONCLUSION ................................................................................54

REQUEST FOR ORAL ARGUMENT .............................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altemus v. Fed. Realty Inv. Trust,*
    490 F. App'x 532 (4th Cir. 2012) ................................................28, 30

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................27, 28

*Blanchar v. Standard Ins. Co.,*
    736 F.3d 753 (7th Cir. 2013) .......................................................50, 52

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)....................................................................27

*Cook v. Carestar, Inc.,*
    No. 11-691, 2013 WL 5477148 (S.D. Ohio Sept. 16, 2013)..........................42

*Counts v. S.C. Elec. & Gas Co.,*
    317 F.3d 453 (4th Cir. 2003) .......................................................28, 37

*Darveau v. Detecon, Inc.,*
    515 F.3d 334 (4th Cir. 2008) .......................................................28, 30

*Fife v. Harmon,*
    171 F.3d 1173 (8th Cir. 1999) .........................................................32

*Fisher v. Rite Aid Corp.,*
    No. 09-1909, 2010 WL 2332101 (D. Md. June 8, 2010) ..............................29

*Ind. Mich. Power Co. v. Renfro,*
    497 F.3d 573 (6th Cir. 2007) .......................................................45, 52

*IntraComm, Inc. v. Bajaj,*
    492 F.3d 285 (4th Cir. 2007) ...........................................................33

*Johnson v. Wellpoint,*
    No. 06-2430, 2009 WL 8753325 (N.D. Ga. Mar. 30, 2009)..........................42

*Jones v. Virginia Oil Co.,*
    69 F. App'x 633 (4th Cir. 2003). ....................................................27, 38

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*,
  203 F.3d 326 (5th Cir. 2000) ...................................................50

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................................28

*McAllister v. Transamerica Occidental Life Ins. Co.*,
  325 F.3d 997 (8th Cir. 2003) ...................................................45

*Mercer v. Arc of Prince Georges Cnty., Inc.*,
  532 F. App'x 392 (4th Cir. 2013). ..........................................37

*Mudgett v. Univ. of Pittsburgh Med. Ctr.*,
  No. 09-254, 2010 WL 1838413 (W.D. Pa. May 6, 2010) ................................38

*Murray v. Stuckey's, Inc.*,
  939 F.2d 614 (8th Cir. 1991) ...................................................38

*Owsley v. San Antonio Indep. Sch. Dist.*,
  187 F.3d 521 (5th Cir. 1999) ...................................................45

*Powell v. Am. Red Cross*,
  518 F. Supp. 2d 24 (D.D.C. 2007)...........................................26, 34, 36

*Q Int'l Courier, Inc. v. Smoak*,
  441 F.3d 214 (4th Cir. 2006) ...................................................27

*Rieve v. Coventry Health Care, Inc.*,
  870 F. Supp. 2d 856 (C.D. Cal. 2012) ...................................24, 41, 42

*Roe-Midgett v. CC Servs., Inc.*,
  512 F.3d 865 (7th Cir. 2008) ...................................................44

*Schaefer-LaRose v. Eli Lilly & Co.*,
  679 F.3d 560 (7th Cir. 2012) ...................................................24, 38, 50

*Smith v. Gov't Emps. Ins. Co.*,
  590 F.3d 886 (D.C. Cir. 2010)..................................................52, 53

ii

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Solis v. Washington,*
  656 F.3d 1079 (9th Cir. 2011) .............................................................32

*Wadley v. Park at Landmark, LP,*
  264 F. App'x 279 (4th Cir. 2008) ................................................24, 37

*West v. Anne Arundel Cnty.,*
  137 F.3d 752 (4th Cir. 1998) ......................................................25, 50

*Withrow v. Sedgwick Claims Mgmt. Servs., Inc.,*
  841 F. Supp. 2d 972 (S.D. W. Va. 2012) ..........................25,42, 45, 52

*Young v. Cooper Cameron Corp.,*
  586 F.3d 201 (2d Cir. 2009) .............................................................32

**STATUTES**

29 U.S.C. § 213(a)(1) ...........................................................................29

29 U.S.C. § 201-219 ("FLSA") ....................................................passim

**RULES**

Fed. R. Civ. P. 56(a) ...........................................................................27

**REGULATIONS**

29 C.F.R. § 541.201(c) ........................................................................38

29 C.F.R. § 541.202(b), (c) .................................................................50

29 C.F.R. § 541.202(c) ........................................................................53

29 C.F.R. § 541.300 ............................................................................29

29 C.F.R. § 541.301(a) ........................................................................33

29 C.F.R. § 541.301(b) ..............................................34, 35, 43, 52

29 C.F.R. § 541.301(e)(2) .............................................26, 30, 34

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

29 C.F.R. § 541.700 ................................................................37

29 C.F.R. § 541.704 ................................................................45

**OTHER AUTHORITIES**

*Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employee, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22122 (Apr. 23, 2004) ................................43

## STATEMENT OF THE ISSUE

Whether the district court properly granted summary judgment on Plaintiff-Appellant Nancy Williams's ("Williams's") claims under the Fair Labor Standards Act and the Maryland Wage and Hour Law because, given the undisputed material facts, a reasonable fact finder could only conclude that Williams's primary job duty is performing exempt work.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

Construed in the light most favorable to Williams, the record evidence

establishes the following undisputed facts that compel summary judgment.

### A.    Williams Is Responsible For Ensuring Safe, Quality, Timely And Cost-Effective Care For Injured Workers.

Defendant-Appellee GENEX Services, LLC ("GENEX") provides services

to help its clients—including workers' compensation insurers and employers—

reduce the costs associated with workers' compensation injuries, ensure quality

care, and improve return-to-work rates and timing.  Among other services,

GENEX provides its clients with medical field case management services, which

helps its clients restore the health and productivity of injured workers as quickly,

safely, and cost-effectively as possible.  *See* Deposition of Andy Nussdorf

("Nussdorf Dep.") at 54:11-15, 98:19-99:6 (Joint Appendix ("JA") 160, 174-75);

*see also* Intracorp's Medical Management Resource Guide (JA 183).

To provide those services, GENEX employs individuals in the Field Medical

Case Manager ("FMCM") position (sometimes referred to as the Field Nurse Case

Manager position) to lead its case management services in the field.  *See* Nussdorf

Dep. at 24:3-14, 54:16-20 (JA 144, 160).  Williams was hired in 2010 as an

FMCM based in Maryland, where she continues to work for GENEX.  *See id*. at

35:14-36:2 (JA 149-50).  She reports directly to her supervisor, Sophia Harris, and

2

indirectly to Andy Nussdorf, the Branch Manager of GENEX's Elkridge, Maryland office.  *See* Transcript of Plaintiff's Deposition ("Pl's Dep.") at 133:21-134:5 (JA 247-48).

Williams describes herself as a "case manager," "life care planner," and "expert witness" who "assess[es] patient needs, design[s] research-driven life care plans, and coordinat[es] delivery of care."  *See* Plaintiff's Résumé (JA 340); Pl's Dep. at 284:13-285:6 (JA 297-98); Emails between Plaintiff and Andy Nussdorf (JA 337-338).  As an FMCM, she reviews medical records, interviews clients, collaborates with the medical treatment team, and performs research to "project current and long-term medical needs and their economic impact."  Plaintiff's Résumé (JA 340).  In her own words, Williams has "a proven ability to comprehend complex healthcare concepts, practices and procedures to define healthcare improvement and tactical strategies" and promotes "continuous quality care improvement through identification of areas requiring intervention, design of strategies and corrective action plans for patient care."[1]  *Id.*

## B.    Williams Performs Work Directly Related To The Management Or General Business Operations Of GENEX And Its Clients.

GENEX's clients are mainly insurance companies and self-insured employers.  *See* Nussdorf Dep. at 25:13-19 (JA 145).  As an FMCM, Williams

---

[1] At the same time, Williams curiously alleged in her Complaint and at her deposition that her $80,000-a-year job as an FMCM could be performed by a layperson with no medical training.

3

assists GENEX's clients by working with injured workers who are receiving medical treatment.  *See* Nussdorf Dep. at 27:15-28:5, 93:6-11 (JA 146-147, 172). "[H]er job is to determine what is needed to enable a person to move from point A being injured to point B returning to work and coordinating and facilitating that process as long as the goal is to return to work." *Id*. at 24:10-14 (JA 146).

Thus, Williams provides GENEX's clients with medical case management services that include assessing a plan of care, evaluating alternatives, and setting short- and long-term goals to help an injured employee return to work in a timely manner.  *See* Declaration of Andy Nussdorf ("Nussdorf Decl.")  ¶¶ 7-8 (JA 345-46); Pl's Dep. at 280:13-17 (JA 296); Plaintiff's Résumé (JA 340-42).  "The goal is to assist the ill/injured person in an effort to reduce disability, medical expenses and extended unemployment."  Nussdorf Dep. at 98:19-22 (JA 174); Medical Management Resource Guide (JA 184) (customers seek "proactive case management services on the cases they refer to us and expect that we will be able to help impact their financial results").

GENEX's field case management services are important to its customers because, among other reasons, the services help them with personnel management by facilitating an injured worker's return to work.  *See* Pl's Dep. at 280:13-17, 281:4-12 (JA 293, 294).  GENEX's clients do not pay for FMCMs like Williams to provide or authorize medical treatment or make insurance adjustment decisions for

4

workers' compensation claims.  *See* Nussdorf Decl.  ¶ 8 (JA 346).  Rather, they

pay for FMCMs to provide them with medical case management services that

include assessing a plan of care, evaluating alternatives, and setting short- and

long-term goals to help an injured employee return to work in a timely manner.

*See id*.  ¶¶ 7, 8 (JA 345, 346); Pl's Dep. at 280:13-17 (JA 293); Plaintiff's Résumé

(JA 340) (summarizing her duties as an FMCM).

GENEX's clients "find value in having a [Field Medical Case Manager] who

is a registered nurse be able to analyze the case, meet with the injured worker and

physicians so they can directly ask questions and observe what is happening, and

make recommendations regarding treatment options and affirm that the prescribed

treatments are appropriate."  Nussdorf Decl.  ¶ 8 (JA 346).  And GENEX's clients

expect FMCMs like Williams to serve as consultants and to provide them with

medical expertise that the clients' claims adjustors or other employees handling

these cases do not have.  *Id.*

### C.    GENEX Requires FMCMs Like Williams To Maintain Certain Professional Credentials, And Williams Is One Of GENEX's Most Highly Credentialed Case Managers.

FMCMs like Williams "are required to have appropriate licensures and

certifications as dictated by state and federal regulations . . . and to keep such

licensures and certifications renewed and in good standing during their

employment with GENEX."  GENEX's Employee Handbook (JA 349).  As

5

relevant here, Maryland law requires FMCMs to be both licensed registered nurses ("RNs") and also certified in Workers Compensation Case Management by the Maryland Board of Nursing.  *See* MWCC – Frequently Asked Questions Pertaining to Qualifications (JA 351); Pl's Dep. at 89:16-21 (JA 225); Nussdorf Dep. at 41:5-8, 43:12-14 (JA 151, 153).[2]

Williams holds a Bachelor of Science degree in nursing and is a licensed RN in Maryland.  *See* Plaintiff's Résumé (JA 341); *see also* Pl's Dep. at 66:11-67:1, 68:22-69:1 (JA 215-16, 217-18).  She is also certified in Workers' Compensation Case Management by the state authorities.  *See* Maryland Workers' Compensation Commission Listing of Registered Nurse Case Managers (JA 362).

Williams is one of GENEX's most highly credentialed FMCMs.  *See* Nussdorf Decl.  ¶ 4 (JA 345).  In addition to the above qualifications, Williams lists numerous professional certifications on her resume, including being a Certified Life Care Planner;[3] a Certified Disability Management Specialist;[4] a

---

[2] Accordingly, GENEX has never hired an FMCM in Maryland who was not a licensed RN.  *See* Nussdorf Dep. at 59:19-21 (JA 163); Nussdorf Decl.  ¶ 3 (JA 344).

[3] "The purpose of the CLCP credential is to measure the CLCP applicant's working knowledge of medical systems, associated disabilities, and treatment/maintenance protocol required for a catastrophically disabled individual to sustain life within an acceptable comfort level."  *See* http://www.ichcc.org/clcp.html (last visited 11/17/14).

[4] "Those who hold the Certified Disability Management Specialists (CDMS) credential possess specialized knowledge and skills to assist them when navigating

6

Certified Case Manager; and a Certified Critical Care Nurse. *See* Williams's Résumé (JA 341); Pl's Dep. at 71:21-72:9 (JA 219-220).[5]

Williams estimates that to keep her certifications current, she spends about sixty hours per renewal period engaging in continuing education for each of her certifications. *See* Pl's Dep. at 85:14-86:4 (JA 223-224). GENEX also requires Williams to take continuing education courses that are relevant to her job, such as courses on "Narcotics Medication Safety," "Catastrophic Case Management," and "Ethical Foundations of Healthcare and Counseling, Responsibilities and Decision Making." *See* Pl's Dep. at 90:8-91:6, 95:3-15 (JA 226-27, 230); Verification of Completion Forms (JA 377-87). In light of her extensive medical training and experience, Williams has a preference for taking on complex and challenging cases. *See* Pl's Dep. at 75:19-22; Plaintiff's email to Kristi Grier dated July 31, 2012 (JA 389) ("I think I am pretty good [at] challenging cases."); Plaintiff's email to Andy Nussdorf dated January 6, 2012, (JA 393) (stating what she wants "are some big fat messed up cases"); Plaintiff's Performance Evaluation (JA 356)

---

the complex world of disability management. They are better equipped to analyze, prevent, and alleviate the human and economic impact of disability." *See* http://www.cdms.org/CDMS-Certification/Content/cdms-certification.html (last visited 11/17/14).

[5] Although the FMCM position does not require these additional credentials, Williams listed them on her employment application as relevant licenses (JA 341) and also listed them in her work email signature block (JA 556).

("Nancy consistently shows her willingness to take on cases that challenge her professionally.").

### D.    GENEX Paid Williams Over $80,000 Per Year On A Salary Basis.

Throughout her employment, GENEX has paid Williams on a salary basis. *See* Williams's Opening Brief ("Opening Br.") at 3.  Specifically, she received $83,354.14 in compensation in 2012 and $81,103.29 in 2013.  *See* Nussdorf Decl. ¶ 5 (JA 345).

### E.    Williams's Duties Include Developing And Administering Care Plans To Facilitate An Injured Worker's Appropriate And Timely Return To Work.

FMCMs like Williams "are hired as consultants to the insurance industry so it's important for them to be able to analyze, interpret medical reports, analyze what is going on in a file, and to reach a conclusion as to whether or not it's going in the right direction . . . [and] provide that opinion to the referral source." Nussdorf Dep. at 47:19-48:7 (JA 155-56); *see also* Job Aid – Report Writing (JA 396) ("You are hired as a consultant.  Your report should reflect that."); Nussdorf Decl.  ¶ 8 (JA 346).

Williams handles between fifteen and twenty-two cases at a time.  *See* Nussdorf Dep. at 92:16-17 (JA 171).  For each case, she generally will assess the injured worker's medical condition and treatments in an effort to understand the case and to look for opportunities to minimize an injured worker's time away from

8

work.  *See* Nussdorf Dep. at 47:9-18, 49:20-50:2, 50:14-51:3, 99:7-21 (JA 155,

157-59, 175); Role of a Medical Case Manager (JA 197) (explaining that the

activities include "evaluating the ill/injured person's overall status and treatment

program" and "identifying existing and potential problems and then recommending

appropriate intervention"); Job Description for FMCM position (JA 683) (stating

that Case Managers are to "research alternative treatment programs").

　　　To properly evaluate an injured worker's condition and the medical

treatments he or she is receiving (and may need to receive), Williams conducts

initial and subsequent assessments.  *See* Pl's Dep. at 216:11-217:7 (JA 273-274).

In performing these assessments, she interviews the injured worker and analyzes

the worker's pertinent medical information, including medical history, current

status, diagnosis, prognosis, and current treatment plan.  *See* Pl's Dep. at 230:17-

231:8 (JA 227-28); *see also* WCC Mandatory Training (JA 414-50); Field Case

Management Guidelines for Liberty Mutual (JA 456) ("Liberty Mutual has

requested that GENEX reports should reflect the nurse case manager's assessment

and observations of the patient when meeting with the provider rather than

regurgitate the provider's notes.").  If Williams believes that more records or

information are needed for her assessment, she can independently request those

records for her review.  *See* Nussdorf Dep. at 125:20-126:1 (JA 177-78);

Catastrophic/Trauma Progress Report (JA 464) ("I would encourage . . . obtaining

9

all records and then looking into the presenting lab values at shock trauma to see

what his Blood sugars were on admission – this could potentially be the etiology

for the fall.").

As part of her ongoing assessment of an injured worker's medical condition

and treatment, Williams attends medical appointments with the worker, during

which she can ask doctors questions about the course of treatment.  *See* Pl's Dep.

at 224:20-225:1 (JA 275-76); Medical Management Resource Guide (JA 184)

(noting that FMCMs constantly evaluate the ill/injured person's response to

treatment); Nussdorf Decl.  ¶ 8 (JA 346).  Williams then serves as a consultant to

educate injured workers and insurance claims adjustors regarding the worker's

injuries and treatments.  *See* Pl's Dep. at 57:15-58:3, 185:17-186:9, 210:3-6 (JA

213-14, 264-65, 270) (she provides medical information regarding the injured

worker to the insurance companies and will explain medical information to the

claims adjustors to help them better understand a diagnosis); Nussdorf Dep. at

100:9-12 (JA 176) (nurse case managers "will provide education to the ill and

injured person and family and support persons regarding . . . medical status and

treatment"); *see also* Job Description (JA 683) (listing as a duty "[s]erv[ing] as an

intermediary to interpret and educate the individual on his/her disability, and the

treatment plan established by the case manager, physicians, and therapists"); Field

Case Management Audit Form (JA 688) (evaluating Williams on medication

10

safety, including "teaching performed by the case manager relative to medication use and adherence").

For example, in a case involving a catastrophically injured firefighter who was seeking a face transplant, Williams attended numerous appointments with him, sometimes as many as five or six a day, and spent over 100 hours managing his case. *See* Pl's Dep. at 269:6-270:1, 273:17-274:8 (JA 289-90, 291-92). In another case, an injured worker emailed Williams that he was experiencing serious pain and felt something was not right after returning to work. *See* June 23, 2012 Email exchange (JA 707). Williams used her medical knowledge to respond that stress might be causing the pain and recommended that the injured worker contact his physical therapist. *Id.*

Although she has extensive interactions with injured workers, Williams does not provide hands-on care to them, and it is the healthcare providers who authorize specific treatments. *See* Nussdorf Dep. at 69:12-70:8 (JA 164-65); Pl's Dep. at 311:4-6 (JA 304). Williams does, however, analyze whether the prescribed treatment is appropriate and provides recommendations as needed for alternative forms of treatment. *See* Pl's Dep. at 111:15-20, 172:1-5 (JA 235, 261); Nussdorf Dep. at 71:15-18 (JA 166); *see also* Field Case Management Service Guidelines for CNA (JA 483) (requesting that an injured worker's "[m]edical treatment plan must be analyzed and explained" and that the nurse case manager "document

11

whether medication is appropriate for injury").  For example, Williams may

recommend a particular therapist.  *See* Pl's Dep. at 171:11-12, 185:1-3 (JA 260,

264).  Or she may recommend that an injured worker be referred to a particular

hospital because it has excellent specialists in a particular area—as Williams did in

one case, where the treating physician accepted her recommendation and referred

the injured worker to that hospital.  *See* Pl's Dep. at 347:19-348:12 (JA 323-24);

Catastrophic/Trauma Progress Report (JA 465).[6]

In another instance, Williams recommended that an injured worker receive

an independent medical evaluation to help clarify the diagnosis and treatment plan.

*See* Pl's Dep. at 183:13-18 (JA 263).  And she recommended in another case that

an injured worker not be discharged from the hospital "when he had a remarkable

complication" and in her judgment discharge would "impose additional risk and

turmoil onto the already troubling situation and family."  Pl's Dep. at 196:9-197:4

(JA 266-67); *see also* patient update email (JA 490) ("I advised Risk Management

at the Hospital [that it] needs to become involved in this case ASAP – needs

Hospitalist and Neuro consults as well . . . . Very worried about this gentleman –

---

[6] For this particular claim, Williams also obtained the injured worker's past
medical records and lab results so that she could review them and help the
insurance company determine whether the worker's diabetes may have caused his
injuries.  *See* Pl's Dep. at 348:18-349:18 (JA 324-25); Catastrophic/Trauma
Progress Report (JA 465).

will reach out to the wife again and probably go see her over the weekend if okay

with you.").

Although her recommendations are not always adopted, Williams admits

that they certainly can be influential:

> Q.  At times do [healthcare providers and claims adjustors] adopt your
> recommendations?
>
> A.  **They may look at the resources that I'm providing and elect to
> go with those resources.  Yes.**

Pl's Dep. at 112:2-6 (JA 236) (emphasis added); *see also id*. at 338:9-13 (JA 321)

(admitting she provides recommendations, education, and suggestions).

In addition to conducting an ongoing assessment of an injured worker's

condition and medical treatment, Williams is responsible for developing an

individualized care plan that will assist the injured worker in returning to work in a

timely and safe manner.  *See* Medical Management Resource Guide (JA 183)

(noting that medical case management involves "developing a service plan").

Essential parts of developing that plan include:

> [S]etting mutually agreed-upon goals with measurable objectives,
> determining action steps toward achieving goals, and selecting
> essential resources and services through consultation and
> collaboration with health care professionals, the ill/injured person, and
> the family or other support persons.  Your planning will result in goals
> and recommendations to be submitted and approved by the customer.

*Id.* (JA 183-84); *see also* Nussdorf Dep. at 72:7-18, 76:18-21 (JA 167, 168); Field

Case Management Audit Form (JA 688) (highlighting that Williams and other

13

nurse care managers are evaluated, in part, based on their initial and ongoing patient specific case management plans, which must include "anticipated case results, [care management] issues, Long-term and Short-term Case Management Goals . . . and [care management] recommendations with target dates").

Most, if not all, of GENEX's clients have a template or report format that FMCMs like Williams use in reporting their observations and recommendations and otherwise documenting their care plans.  *See* Pl's Dep. at 158:19-159:1 (JA 255-56).  Although GENEX's clients desire to have information provided to them in a consistent *format*, the *substance* of each care plan that Williams develops is comprised of her own language tailored to the injured worker's individual needs and medical conditions.  *See* Pl's Dep. at 159:2-13 (JA 256); *see also* Job Aid – Report Writing (JA 396) ("Your report should be full of case management work rather than paragraphs of what the doctor has said or done. You are hired as a consultant.  Your report should reflect that."); Field Case Management Service Guidelines for Zurich Services Corporation (JA 496) (stating expectation for "[s]pecific recommendations" and that "Short Term Goals should be client centered and specific to client objectives and expectations").

Each care plan that Williams develops also must establish and document measurable short- and long-term goals specific to the individual.  *See* Pl's Dep. at 327:1-3 (JA 311); Field Case Management Service Guidelines for Sedgwick (JA

14

504).  Examples include setting a target date for a return to work and any appropriate limitation based on Williams's understanding of the injured worker's job and workplace.  *See* Pl's Dep. at 212:8-14, 213:5-17 (JA 271, 272); Catastrophic/Trauma Progress Report (JA 472) (one long-term goal was having the injured worker's return to "pre-injury functional status" by 12/1/13).

Williams also analyzes for GENEX's clients whether the injured worker has achieved the goals that she has set.  For example, Williams noted that she "assisted with determining that [the injured worker's] therapy was not successful" and discussed the issues with the injured worker and the worker's attorney.  *See* Status Report (JA 529).  The importance of individualized recommendations and goals is reflected in the fact that GENEX's clients evaluate Williams based in part on how well she documents her case management plan and whether she establishes case-specific short- and long-term goals.  *See* Pl's Dep. at 326:17-327:6 (JA 350-51); *see also* Sedgwick Scorecard (JA 552) (showing that Plaintiff is rated on creating measurable short- and long-term goals); Field Case Management Audit Form (JA 688) (same).

In developing care plans, Williams performs research as needed on an injured worker's condition and analyzes whether the existing and planned medical treatments are consistent with clinical criteria and treatment guidelines for the condition.  *See* Pl's Dep. at 205:4-6 (JA 269); Field Case Management Audit Form

15

(JA 688) (evaluating nurse case managers on whether they document a "physician's prescribed treatment plan and whether or not [the] same is in compliance with [the] treatment recommended by the treatment guideline/criteria used"); Status Report (JA 525) (Plaintiff's entry for 6/28/13: "Rehab planning – check guidelines, review case notes for benchmarks in treatment and set goals with diary dates"). Williams further identifies any preexisting medical conditions that may be a barrier to recovery. *See* Catastrophic/Trauma Progress Report (JA 471) (identifying hypertension and diabetes and "medical comorbidities that may impact recovery").

In addition to developing her own care plans, Williams may evaluate a life care plan to assist a GENEX client in litigation. *See* Pl's Dep. at 338:18-339:10 (JA 321-22); Review of Life Care Plan (JA 537-44). For instance, in conducting one such review, Williams analyzed the patient's medical and school records, conducted an interview with the patient and her mother, and researched and investigated the "correlation of Apgar and low birth weight and incidence of Severe Cases of Cerebral Palsy" and the long-term care needs of cerebral palsy. *See* Review of Life Care Plan (JA 537-44). In summarizing her review of the life care plan, Williams exercised her professional judgment in reaching detailed and definitive conclusions. *Id.* (JA 544) ("A thorough assessment has been

accomplished in the review of . . . alleged medical issues . . . . It is my opinion that the existing Life Care Plan is wholly void").

In developing care plans and making recommendations to GENEX's clients, Williams admits she is "using either known medical knowledge, or I've gone and done some research to provide to them to help educate them." Pl's Dep. at 321:12-322:3 (JA 307-308); *see also* Job Description (JA 683) (nurse case managers are expected to use "clinical/nursing skills" and "educate" an injured worker regarding his/her disability). Additionally, the Maryland Board of Nursing Standards of Care for workers' compensation cases states that care plans shall "reflect current nursing practices" and prescribe "interventions to attain expected outcomes." *See* JA 548. Williams admits that in developing care plans and performing her duties, she largely complies with these standards. *See* Pl's Dep. at 329:9-11, 337:10-13 (JA 313, 320).

Another critical part of Williams's job is controlling healthcare costs, assisting with medical cost containment, and looking for ways to reduce disability expenses. *See* Nussdorf Dep. at 24:15-21, 29:4-6 (JA 144, 148). One way in which she helps GENEX's clients achieve these goals is by coordinating an injured worker's treatment and return to work. Pl's Dep. at 106:22-107:4, 107:7-10 (JA 232-33). Indeed, Williams spends the majority of her time meeting and communicating with injured workers, healthcare providers, physical therapists and

17

claims adjustors. *See* Nussdorf Dep. at 93:21-94:10 (JA 172-173). There is no

dispute that, on average, she spends about 90 percent of her time:

> [M]eeting with the doctor, could be spent meeting [with] the physical therapist, could be spent meeting with the injured worker, could be spent communicating with the injured worker via phone, via e-mail, could be communicating with the physicians or physical therapists via phone or e-mail, could be spent writing a letter to the doctor, to the claimant, to the physical therapist, could be spent communicating with the adjustor, could be spent in research.

Nussdorf Dep. at 94:1-10 (JA 173). Nor is there a dispute that, on average, she

spends the remaining 10 percent of her time on what she considers the

"administrative" task of preparing reports for clients. *See* Nussdorf Dep. at 93:17-

20 (JA 172); Pl's Dep. at 355:3-14 (JA 329).

The importance of Williams proactively managing cases is reflected in the

"scorecards" GENEX's customers use to evaluate the case management services

they receive. *See* Pl's Dep. at 325:3-5 (JA 309); Sedgwick Case Management

Scorecard (JA 551-52). For example, the insurer Sedgwick looks for case

management interventions to "reflect pro-active, aggressive [return to work]

management/coordination" and "aggressive medical management/coordination."

(JA 552); *see also* Field Case Management Audit Form (JA 689) (evaluating

whether a nurse case manager has documented that he or she has taken actions

"which resulted in a clear value/benefit to the customer with respect to

management of the claim").

18

Williams admits that she proactively manages her cases consistent with these client expectations. *See* Pl's Dep. at 168:20-22 (JA 259). And according to her branch manager, doing so "requires medical knowledge in order to understand what's going on in the file, potential consequences, what's going on in the case." Nussdorf Dep. at 87:6-11 (JA 169). If Williams determines that an injured worker is not following the treatment or care plan, she will work to get the injured worker to follow the plan so that the worker can return to work as quickly as possible. *See* Pl's Dep. at 143:9-144:2 (JA 251-52).

In serving as a "master coordinator" of healthcare team members, Williams testified that her responsibilities are similar to those when she was a trauma nurse.[7] *See* Pl's Dep. at 107:7-16, 183:2-6 (JA 233, 263); *see also* JA 556 ("I am a nurse with GENEX Services Inc. and I have been ask[ed] to visit with you to address your current needs."). Both in her role as a trauma nurse and as an FMCM, Williams provided input and information that the doctor could use in making decisions regarding a patient's treatment. *See* Pl's Dep. at 115:22-116:7 (JA 239-40). For example, she provides information about whether an injured worker is physically able to perform the duties of his or her job. *See* Pl's Dep. at 113:22-114:16 (JA 237-238). Although Williams, like any nurse, cannot change a doctor's

---

[7] Williams worked as a trauma nurse from 1983 to 1991. *See* Plaintiff's Résumé (JA 341); Pl's Dep. at 66:11-68:10 (JA 215-17). And Williams admits that as a trauma nurse, she used medical knowledge in performing her duties. *See* Pl's Dep. at 314:17-19 (JA 305).

19

final decision with regard to treatment, she admits that this limitation is no different from when she was a trauma nurse. *See* Pl's Dep. at 110:11-14 (JA 234). In both positions, Williams collected and recorded information that would then be reviewed by others, i.e.*,* doctors and claims adjustors, who had final decision making authority. *See* Pl's Dep. at 315:11-17 (JA 306).

### F.    Williams's Duties Included The Exercise Of Independent Judgment And Discretion.

Williams has never worked in a GENEX office. *See* Pl's Dep. at 133:14-19. (JA 246)  Instead, she works out of her home, car, and in various locations in the field such as physicians' offices and injured workers' homes. *See id*. 128:10-129:4 (JA 244-45).

It has been more than two years since Williams last saw her manager, Andy Nussdorf, and more than a year and a half since she last saw her supervisor, Sophia Harris. *See id*. at 134:6-12 (JA 247).  She also testified that, at times, a month can go by without her even having a phone call with either of them. *See id* at 134:13-22 (JA 247).   Similarly, with regard to receiving emails, "sometimes a long time goes by and there's no communications" from Nussdorf or Harris. *See id*. at 144:16-21 (JA 252).

Williams's supervisors have never participated in her phone calls or appointments with patients or insurance adjusters. *See* Pl's Dep. 135:1-4, 136:2-137:1 (JA 248, 249-50).  Her supervisors do not review her email exchanges with

20

these individuals, either.  *See* Pl's Dep. 136:12-17 (JA 249).  To the extent her

supervisors edit the care plans and reports that she prepares for GENEX's clients,

the editing is minimal.  *See* Nussdorf Decl. at ¶ 6 (JA 345).

Moreover, consistent with her substantial independence, Williams does not

rely on any handbooks or guidelines provided by GENEX.  *See* Pl's Dep. at

235:22-236:6 (JA 280-81).  To the extent she uses account guidelines provided by

GENEX's clients, those guidelines merely set out deadlines for the completion of

certain tasks or instructions as to which tasks are billable.  *See* Pl's Dep. at 241:17-

242:6, 266:22-267:6 (JA 282-283, 287-88); *see also* Field Case Management

Service Guidelines for Sedgwick (JA 505-06).  Williams thus testified:

> Q.  And you consult the account guidelines for what purpose?  You've
> identified one purpose being to identify timing requirements.  What
> other purpose do you consult them for?
>
> A.  Billing.  Billing constraints.
>
> Q.  Anything else?
>
> A.  That's mostly what they're about.

Pl's Dep. at 250:3-10 (JA 284).

As explained above, to the extent that GENEX's clients provide templates

for case reports, Williams still must tailor the *substance* of her input based on the

particular case.  For example, the insurer Sedgwick requires medical case

managers to provide "short term and long term goals that drive case outcomes and

21

specific action the [field case manager] will take towards medical and return to work management." Field Case Management Service Guidelines for Sedgwick (JA 285-286); Pl's Dep. at 257:19-258:2 (JA 285-286).

And even when using templates, Williams provides her own recommendations and is not to merely repeat the information that the physician or therapist provides. *See, e.g.*, Field Case Management Guidelines for Liberty Mutual (JA 456) ("Liberty Mutual has requested that GENEX reports should reflect the nurse case manager's assessment and observations of the patient when meeting with the provider rather than regurgitate the provider's notes."). She must necessarily use her medical knowledge to "communicate what's going on effectively and knowledgeably." Nussdorf Dep. at 87:3-6, 88:5-12 (JA 169, 170); *see also* Performance Appraisal (JA 354) (evaluated on her ability to "produce informative and comprehensive case management reports").

Further, in performing her duties, Williams uses critical thinking skills. *See* Performance Appraisal (JA 356). For example, she admits that she largely complies with the standards set forth by the Maryland Board of Nursing for Medical Case Management—and thus does not dispute the standards applying to her day-to-day duties as a Field Medical Case Manager, all of which turn on critical thinking and analysis:

22

- The RN shall analyze the data, consider the options, including technology, and make a determination as to whether the selected options are appropriate for the needs of the client.

- The RN shall identify expected outcomes individualized to the client. The outcomes should be attainable in relation to the resources available to the client, and documented as measureable goals with time estimates for attainment as appropriate.

- The RN shall develop a plan of care that prescribes interventions to attain expected outcomes. The plan shall reflect current nursing practice, provide for a continuity of care and be individualized in a comprehensive, systematic and ongoing manner.

- The RN shall implement the interventions identified in the plan of care.

- The RN shall evaluate the client's progress toward attainment of outcomes and ongoing assessment data shall be used to evaluate the process of care to revise the nursing diagnosis, outcomes and the plan of care and the effectiveness of interventions shall be evaluated in relation to outcomes.

*See* Board of Nursing Standards of Care for Medical Case Management (JA 546-49); Pl's Dep. at 328:2-335:14 (JA 312-19).

In sum, Williams serves as a consultant for GENEX's clients. *See* Nussdorf Dep. at 47:19-48:7 (JA 155-156). Consistent with that role, she analyzes medical information and then, based on her analysis, makes recommendations and takes action in an effort to achieve a desirable outcome for the client. *See e.g.*, Pl's Dep. at 112:2-6, 205:4-6, 212:8-14, 213:5-17 (JA 236, 269, 271, 272).

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment because Williams did not and cannot identify any record evidence that creates a *genuine* issue as to any *material* fact regarding whether she qualifies as an exempt employee under the FLSA and its state-law equivalent.  On appeal, Williams attempts to manufacture material fact issues by re-labeling her duties.  But the law is clear that actual job duties, not labels applied to them, determine exempt status.  *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 580 (7th Cir. 2012) ("It is those day-to-day duties on which a proper analysis under the FLSA rests, not merely the parties' characterizations of those duties as involving discretion or not"); *cf. Wadley v. Park at Landmark, LP*, 264 F. App'x 279, 281 (4th Cir. 2008) ("[Plaintiff's] own self-serving, unsubstantiated statements in opposition to [his former landlord's] evidence [that the plaintiff was not discriminated against] is insufficient to stave off summary judgment.").  And the actual job duties conclusively established by the record evidence in this case amply demonstrate that Williams is exempt as a matter of law under the learned professional exemption.  Indeed, the only courts to have analyzed medical case managers who are RNs and have duties analogous to Williams's have held that these individuals qualify as exempt learned professionals.  *See Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856 (C.D.

24

Cal. 2012); *Withrow v. Sedgwick Claims Mgmt. Servs., Inc.*, 841 F. Supp. 2d 972 (S.D. W. Va. 2012).

Williams asserts that even though she receives compensation of approximately $80,000 per year and holds herself out to the public as a highly credentialed professional, she subjectively views herself as a mere scribe who never used her medical knowledge in performing duties for GENEX. Incontrovertible record evidence, however, belies that self-serving view and establishes beyond contradiction that Williams used her skills, training and knowledge as a registered nurse to perform her duties as an FMCM.

It is undisputed that in reviewing medical records, analyzing injured workers' medical conditions and needs, interviewing and educating injured workers and their families, coordinating care, and developing short- and long-term goals for injured workers, Williams's duties required her to use her medical knowledge. Although Williams could not authorize treatment or override a physician's decision, it is well-settled law that an employee can exercise discretion and judgment without having final authority on decisions. *See, e.g.*, *West v. Anne Arundel Cnty.*, 137 F.3d 752, 764 (4th Cir. 1998) (the "fact that some recommendations made by [an employee] are subject to review by superior officers is no bar to application of the administrative exemption"). And Williams admitted that her inability to unilaterally authorize treatment is no different than the level of

25

authority possessed by exempt registered nurses working for hospitals or medical practices that have always been recognized as exempt. *See* 29 C.F.R. § 541.301(e)(2) ("Registered nurses . . . generally meet the duties requirements for the learned professional exemption"); *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 39 (D.D.C. 2007) (finding RN was exempt and collecting cases holding the same).

Contrary to Williams's conclusory denial that she used discretion in performing her duties, the record evidence establishes that she was subject to very little supervision. Williams's testimony confirmed that she went months without seeing her supervisor and rarely spoke with him. She exercised discretion and independent judgment throughout each day in evaluating treatment plans, making recommendations to physicians and claims adjustors, and negotiating the return to work of patients. To the extent that Williams followed client guidelines and used client forms, they did not curtail her use of her medical knowledge and independent judgment but simply provided a regularized format for communicating that judgment.

In sum, because there is no genuine dispute of material fact that Williams satisfies the professional exemption, summary judgment was proper and the judgment below should be affirmed.[8]

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*.  *See, e.g.*, *Jones v. Virginia Oil Co.*, 69 F. App'x 633, 636 (4th Cir. 2003).  Under the familiar summary-judgment standards, summary judgment is appropriate where there is "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[8] In addition to relying on the learned professional exemption, GENEX moved for summary judgment on the alternative grounds that Williams is also exempt under either the "administrative" or the "combination" exemption.  *See* JA 121, 128-40, 737-749.  Given its determination that the learned professional exemption applies as a matter of law, the district court had no need to address GENEX's alternative arguments for summary judgment.  *See* Memorandum and Order (JA 81 n.12).  As a result, even if this Court disagrees that summary judgment was proper as to the learned professional exemption, it should remand so that the district court can consider GENEX's alternative grounds for summary judgment in the first instance.  *See Q Int'l Courier, Inc. v. Smoak*, 441 F.3d 214, 220 n.3 (4th Cir. 2006) ("Although we are not precluded from addressing [questions the district court did not reach], we deem it more appropriate to allow the district court to consider them, if necessary, in the first instance on remand.").

27

Evidence presented by the nonmoving party that is merely colorable or not significantly probative cannot preclude summary judgment. *Anderson*, 477 U.S. at 249-50. And a party cannot create a genuine dispute about a material fact through mere speculation or compilation of inferences. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts") (citations omitted).

Where, as here, a position is exempt under the Fair Labor Standards Act ("FLSA") as a matter of law, summary judgment is proper. *See Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532 (4th Cir. 2012) (noting that the determination whether an employee falls within the scope of an FLSA exemption is ultimately a question of law).

## II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE WILLIAMS IS A LEARNED PROFESSIONAL EXEMPT FROM THE FLSA AS A MATTER OF LAW.

As this Court has repeatedly recognized, the "FLSA was meant to protect low paid rank and file employees, not higher salaried managerial and administrative employees who are seldom the victims of substandard working conditions and low wages." *Counts v. S.C. Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003) (internal quotation and citation omitted); *Darveau v. Detecon, Inc.,* 515 F.3d 334, 338 (4th Cir. 2008) (same). Thus the FLSA expressly exempts from

28

its overtime requirements any employee who is paid on a salary basis and works in

a "bona fide executive, administrative, or professional capacity."[2]  29 U.S.C. §

213(a)(1).  In this case, the district court correctly held that GENEX is entitled to

summary judgment because it can establish all of the elements of its defense that

Williams qualifies for the professional exemption.  *See* Memorandum and Order

(JA 67).

An exempt professional employee is one: (1) who is paid on a salary or fee

basis (as defined in the regulations) at a rate not less than $455 per week; and (2)

whose primary duty is (i) the performance of work requiring advanced knowledge;

(ii) in a field of science or learning; (iii) that is customarily acquired by a

prolonged course of specialized intellectual instruction.  29 C.F.R. § 541.300.  As

demonstrated below, and as the district court correctly held, the record evidence in

this case conclusively establishes that each element is satisfied as a matter of law.

### A.    <u>Williams Does Not Dispute That The Salary Basis Requirement Is Satisfied.</u>

As an initial matter, Williams does not dispute that the salary basis test is

satisfied as a matter of law.  Indeed, her total compensation in 2013 was

$81,103.29.  *See supra* 29.  Although a generous salary alone is not dispositive in

---

[2] The Maryland Wage and Hour Law (MWHL) is Maryland's "equivalent of the FLSA." *Fisher v. Rite Aid Corp.*, No. 09-1909, 2010 WL 2332101, at *2 (D. Md. June 8, 2010).  Williams's claim under the MWHL thus fails as a matter of law for the same reasons that are fatal to her FLSA claim.

determining exempt status under the FLSA, because the FLSA "was meant to protect low paid rank and file employees," *Darveau*, 515 F.3d at 338 ( citation omitted), this Court has recognized that a comparably high salary of $84,000 (plus bonus) "itself creates doubt as to whether [an individual] falls within the scope of the intended protected class in light of the legislative goals of the FLSA." *Altemus*, 490 F. App'x at 537.

> **B.    The Primary Duty Requirement Is Satisfied As A Matter Of Law Because The Record Evidence Conclusively Establishes That Williams's Primary Duty Was To Perform Work Requiring Advanced Knowledge In A Field Of Science Or Learning Acquired By A Prolonged Course Of Specialized Instruction.**

Williams satisfies the professional exemption's primary duty test for two independent reasons:  (1) the applicable regulations provide that registered nurses, like Williams, generally satisfy the duties test, *see* 29 C.F.R. § 541.301(e)(2); and (2) Williams otherwise satisfied the duties test of the exemption.  Williams cannot create a genuine dispute as to any fact material to either of these arguments.

> **1.    The Learned Professional's Primary Duties Test Is Satisfied Because Williams's Job Requires Her To Be A Registered Nurse.**

The Department of Labor instructs that "[r]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."  29 C.F.R. § 541.301(e)(2). It is undisputed that GENEX requires Williams to be a registered nurse to work as

30

an FMCM.  *See supra* 5-6.  And it is undisputed that Williams is a registered nurse.  *See* JA 341.  Indeed, Williams's brief concedes (Opening Br. at 43) that she and all other FMCMs "working for GENEX in Maryland are required to be registered nurses."

Nonetheless, Williams attempts to manufacture a fact issue by arguing (Opening Br. at 43) that the requirement is "illusory" because it is imposed by state law.  Not surprisingly, Williams cites no authority for that novel argument—and if anything, the fact that state law *requires* GENEX to hire only registered nurses for the position at issue is itself powerful evidence of its professional character.

Perhaps recognizing as much, Williams falls back on the argument that the job description for FMCMs does not require her to be a registered nurse.  *See* Opening Br. at 43.  That is incorrect.  The job description, which was not drafted specifically for Maryland-based FMCMs, plainly states that they must have "[o]ther state licenses/certifications as required by law"—which in Maryland requires a license as a registered nurse.  *See* Job Description (JA 684) (also requiring FMCMs to maintain all "necessary credentials"); *see also* Nussdorf Dep. at 40:13-16, 41:5-11 (JA 755, 756) ("In order to be qualified for the case manager medical position that's set forth in the job description, do they need to be an RN?  Yes, they do."); GENEX's employee handbook (JA 349) (stating that FMCMs are "required to have appropriate licensures and certifications as dictated by state and

federal regulations").  Accordingly, there is no genuine dispute that GENEX

required Williams and all other FMCMs in Maryland to be licensed registered

nurses.[10]

It also does not matter that Williams's two supervisors are not RNs.  *See*

Opening Br. at 46-47.  They are not performing the same job duties as Williams

and their exempt status is not at issue.  Indeed, Williams's manager, Andy

Nussdorf, confirmed that his lack of a registered nurse license, and corresponding

lack of medical knowledge that a registered nurse like Williams possesses, would

*prevent* him from performing Williams's job duties:

> Q:    Mr. Nussdorf, are you qualified to do [Williams's] job?
>
> A:    No.
>
> Q:    Why not?
>
> A:    **I'm not an RN, I can't work as a medical case manager**.  I can't manage a medical file, I don't have the medical background to be able to do that.  I wouldn't be able to be qualified by the Maryland Board of Nursing  because I'm not an RN so I wouldn't be able to practice as a medical case manager.

Nussdorf Dep. at 128:1-11 (emphasis added) (JA 762).[11]  Williams cites no

authority, and we are aware of none, that whether an individual is exempt as a

---

[10] That is why Williams' reliance on *Solis v. Washington*, 656 F.3d 1079 (9th Cir. 2011), *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205-06 (2d Cir. 2009), and *Fife v. Harmon*, 171 F.3d 1173 (8th Cir. 1999), is misplaced.  None of those cases involved registered nurses or jobs that state law required to be filled by registered nurses.

32

learned professional depends on whether her supervisors qualify for the exact same

exemption.  To the contrary, because the record is clear that Williams was required

to be a registered nurse to perform her duties, under the controlling regulations

Williams satisfies the professional exemption as a matter of law.  *See IntraComm,*

*Inc. v. Bajaj*, 492 F.3d 285 (4th Cir. 2007) (DOL regulations entitled to controlling

deference).

> **2.      Alternatively, Williams Satisfies The Primary Duties Test**
> **Because She Performs Work Requiring Advanced**
> **Knowledge.**

Even if Williams did not satisfy the duties test of the professional exemption

under the controlling regulations by virtue of her status as a registered nurse, which

she does, she otherwise satisfies that test because her primary duty (i) involves

performing work requiring advanced knowledge; (ii) the advanced knowledge is in

a field of science or learning; and (iii) that the advanced knowledge is customarily

acquired by a prolonged course of specialized intellectual instruction.  29 C.F.R. §

541.301(a).

---

[11] Williams asserts (Opening Br. at 47) that Nussdorf admitted he could be hired by
GENEX as an FMCM, but that is not so.  His testimony reflects only that he
satisfies *some* of the requirements on the job description, but it is undisputed that
Nussdorf does not satisfy the "state licenses/certifications as required by law"
requirement and thus is not qualified to perform Williams's job.  *See* Nussdorf
Dep. at 128:16-132:9 (JA 762-66).

Williams does not challenge the district court's determination that the second and third elements of this test are satisfied by her status as an RN.[12] *See* Memorandum and Order (JA 69) ("Williams satisfies the second and third prongs of the "primary duty" test – she has advanced knowledge in a field of science that the customarily acquired by a prolonged course of study."); *Powell*, 518 F. Supp. 2d at 29 (finding that 29 C.F.R. § 541.301(e)(2) made it clear that RNs possess advanced knowledge in a field of science acquired by specialized instruction based on their possession of a registered nurse license).  Accordingly, only the first prong—whether her primary duty was performing work requiring advanced knowledge—is at issue here.  And as the district court correctly concluded, "any reasonable fact finder would have to agree" that her primary duty was performing work requiring advanced knowledge.  *See* Memorandum and Order (JA 81).

The DOL has defined the phrase "performing work requiring advanced knowledge" to mean "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine, mental, manual, mechanical or physical work."  29 C.F.R. § 541.301(b).  The DOL further explains that "[a]n employee who performs work requiring advanced knowledge generally uses the

---

[12] In addition to being an RN, Williams's additional certifications and the continuing education she partakes to maintain these certifications makes for a particularly compelling case for the application of the professional exemption.  *See supra* 6-7.

34

advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.*

Here, there can be no genuine dispute about the actual duties Williams performs require advanced knowledge, regardless of the labels she may apply to them. These duties include developing care plans to facilitate injured workers' appropriate and timely return to work by reviewing patient's medical records, interviewing patients about their medical conditions and recovery, coordinating medical care, and communicating with injured workers, medical providers, insurers, employers, and attorneys to assess whether a worker was receiving appropriate care. *See* Pl's Opp. (JA 569-570) (acknowledging Williams generally performed the duties on the Job Description for the position); Job Description (JA 682-86); *see also* Pl's Dep. at 285:17-289:8 (JA 296-302) (acknowledging that her resume accurately describes her duties with GENEX); Plaintiff's Résumé (JA 340-42).

Additionally, Williams admits that many of her duties are analogous to her duties as a clinical nurse in a hospital, *see supra* 19-20, which is unquestionably an exempt job.[13] *See* Pl's Dep. at 107:16, 110:11-14, 115:22-116:7, 315:11-17 (JA

---

[13] As both a trauma nurse and as an FMCM, Williams evaluated and educated patients, provided input to doctors, and collected and recorded information that would be reviewed by others, i.e., doctors and claims adjustors, who had final decision making authority. Williams admitted that as a trauma nurse she used medical knowledge in performing her duties. *See* Pl's Dep. at 314:17-19 (JA 305).

35

235, 239-240, 306); Memorandum and Order (JA 67) (noting that Williams introduces herself to injured workers as a nurse); *see also Powell*, 518 F. Supp. 2d at 39 (finding RN was exempt and collecting cases holding the same).

Offering no genuine disagreement about the duties she performed, Williams instead attempts to create a fact issue about whether they involve advance knowledge by (1) trying to dispute the amount of time she is performing these duties; and (2) subjectively labeling her duties as "clerical work" a lay person could perform. Neither argument supports reversal of summary judgment.

**First, the district court properly credited the only record evidence establishing the amount of time Williams spent on her primary duties.** Williams criticizes the district court (Opening Br. at 34) for crediting her supervisor's testimony that she spends approximately 90 percent of her time meeting and communicating with doctors, physical therapists, or injured employees, but she points to no record evidence to contradict that testimony. *See* Nussdorf Dep. at 93:12-94:10 (JA 172-73); *see also* Memorandum and Order (JA 79) (rejecting Williams's assertion that she is a "mere scribe" in light of the fact that she spends only approximately 10 percent of her time writing evaluation reports); Pl's Dep. at 355:3-14 (JA 329) (noting that, on average, she prepares five to seven reports a week and each report takes about 30 minutes to an hour and a half to prepare). To create a material fact issue, it is not enough for a non-movant

36

simply to disagree with the record evidence; rather, a non-movant must actually

controvert that evidence. *See Wadley*, 264 F. App'x at 281 ("[Plaintiff's] own self-

serving, unsubstantiated statements in opposition to [his former landlord's]

evidence [that the plaintiff was not discriminated against] is insufficient to stave

off summary judgment."); *Mercer v. Arc of Prince Georges Cnty., Inc.,* 532 F.

App'x 392, 397 (4th Cir. 2013) ("The object of Rule 56 is not to replace

conclusory allegations of the complaint or answer with conclusory allegations of

an affidavit. . . . [A] nonmoving party cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another. Rather,

a nonmoving party must produce some evidence (more than a 'scintilla') upon

which a jury could properly find a verdict for the party producing it, upon whom

the onus of proof is imposed.") (internal quotation and citation omitted).

In any event, Williams's assertion (Opening Br. at 34) that she needs to

spend at least 50 percent of her time performing exempt work to qualify as exempt

under the FLSA is simply wrong. The amount of time an employee spends on

exempt and non-exempt tasks is not dispositive of whether an employee qualifies

as exempt. *See* 29 C.F.R. § 541.700; *see also Counts*, 317 F.3d at 456 (affirming

the district court's ruling that employees were exempt and noting that "[n]othing in

the FLSA compels any particular time frame for determining an employee's

primary duty"). Thus, courts routinely hold that individuals are exempt even if less

37

than 50 percent of their time is devoted to exempt duties. *See, e.g., Jones,* 69 F.

App'x at 637-39 (holding that a manager who spent 75-80 percent of her time

performing nonexempt duties nevertheless was an exempt employee); *Murray v.*

*Stuckey's, Inc.,* 939 F.2d 614, 618 (8th Cir. 1991) (noting that the fact that an

employee spent 65-90 percent of his time on nonexempt tasks "is not a controlling

factor under the regulations" for determining whether the employee was exempt

from the FLSA's overtime provisions). In sum, the record does not reflect that

Williams spends the majority of her time performing non-exempt work, but even if

she did, this does not disqualify her from being exempt.

**Second, the record evidence conclusively refutes Williams's**

**unsupported and conclusory assertions that she was only a "scribe."**

Williams's attempt to portray herself as a mere scribe (Opening Br. at 40) whose

primary duties did not involve advanced knowledge cannot overcome the

uncontroverted record evidence (including Williams's own deposition testimony)

concerning the nature of her duties. And it is the *substance* of those duties that

determines exempt status, not the *labels* attached to them. *See, e.g.*, 29 C.F.R. §

541.201(c) (exempt status turns on duties, not labels applied in job titles);

*Schaefer-LaRose*, 679 F.3d at 580 ("It is those day-to-day duties on which a proper

analysis under the FLSA rests, not merely the parties' characterizations of those

duties as involving discretion or not"); *Mudgett v. Univ. of Pittsburgh Med. Ctr.*,

No. 09-254, 2010 WL 1838413, at *6, *8 (W.D. Pa. May 6, 2010) (rejecting RN's effort to minimize the amount and complexity of decision-making required by her job).

Here, there can be no genuine dispute that in communicating with various constituents and coordinating care, Williams analyzed medical and other information to understand and synthesize a patient's medical status and work demands, assessed whether care was appropriate, and recommended alternative care options – all of which require advanced knowledge. *See supra* 8-11, 15-17. Williams's attempt to recast those duties as "routine clerical work" is flatly contradicted by the record evidence. For example, Williams's duties included, among other duties discussed above:

- Assessing and evaluating an injured worker including reviewing the worker's pertinent medical information, medical history, diagnosis and current treatment plan. *See* Pl's Dep. at 230:17-231:8 (JA 277-278); WCC Mandatory Training (JA 414-450); Field Case Management Guidelines for Liberty Mutual (JA 456) ("Liberty Mutual has requested that GENEX reports should reflect the nurse case manager's assessment and observations of the patient when meeting with the provider rather than regurgitate the provider's notes").

- Educating patients on their disabilities and "answers any other questions the claimant may have in an effort to facilitate his/her return to work." Job Description (JA 683); Nussdorf Dep. at 99:7-100:12 (JA 175-76) (FMCMs "will provide education to the ill and injured person and family and support persons regarding . . . medical status and treatment"); GENEX Audit Form (JA 688) (evaluating FMCMs on "teaching performed" relative to medication use and adherence); Guidelines for CNA (JA 483) (requesting that the injured worker's "[m]edical treatment plan must be analyzed and

39

explained" and that the FMCM must review whether medication is "appropriate for injury").

- Researching and providing recommendations as to alternative forms of treatment. Pl's Dep. at 111:15-20, 172:1-5 (JA 235, 261); Nussdorf Dep. at 71:15-18 (JA 166); Job Description (JA 683) (noting FMCMs are to "research alternative treatment programs"); *see also* Pl's Dep. at 171:11-12, 185:1-3, 347:19-348:12 (JA 260, 323-24) (discussing Williams's recommendations regarding seeing particular therapists and specialists).

- Developing care plans, that involved setting "goals and recommendations to be submitted and approved by the customer." Medical Case Management Resource Guide (JA 183-84); GENEX Audit Form (JA 688) (evaluating FMCMs and their case management plans, which must include "anticipated case results, CM issues, Long-term and Short-term Case Management Goals . . . and CM recommendations with target dates").

Williams admitted that in developing care plans for patients, she must assess whether the prescribed treatment is consistent with clinical criteria and that she followed the "current nursing practices" as set forth in the Maryland Board of Nursing's Standards of Care guidelines. *See supra* 17. And as the district court correctly observed, Williams's progress reports indicate not only that she "assesses and analyzes claimants' medical conditions, but also provides her own commentary and suggestions." (JA 76) (citing examples of Williams "encouraging" and "suggesting" outcomes and actions).

A review of the samples of care plans in the record (JA 458-72; 510-35; 537-44) makes plain that an individual without medical training could not possibly analyze the medical information handled by Williams each day. Although she was not authorized to provide hands-on treatment to patients or to unilaterally

40

determine their treatments, those irrelevant facts do not alter the critical point that Williams used her medical knowledge to assess patients, evaluate their prescribed treatments, and suggest alternatives when appropriate.

For instance, even a cursory examination of Williams's review of a patient's life care plan (JA 537-44) flatly contradicts Williams's assertion that she "does not provide any independent analysis" of a patient's injuries or course of treatment. *See* Opening Br. at 20.  Indeed, in her review of the life care plan, Williams opines, "The Life Care Plan is a vague incomplete representation of future care and fails to present a cogent and accurate clinical representation of the alleged deficits of [the patient]."[14]  (JA 543).

Additionally, in Williams's report for another patient, she wrote that she analyzed the patient's medical files and "took notes on what to discuss at tomorrow's app[ointmen]t" with the patient's treating physicians.  *See* JA 512.  For another patient, Williams's update to the claims adjustor regarding his worsening condition indisputably reflects that Williams used medical knowledge to assess the situation, cull the key information to provide the claims adjustor, and recommend that risk management become involved.  *See* JA 490.[15]

---

[14] Ironically, Williams criticizes the life care plan for being  drafted in "lay person's" style and not being an "accurate clinical representation."  (JA 543).

[15] The district court concluded that Williams's duties were "almost identical to those of the plaintiff in" *Rieve*, 870 F. Supp. 2d 856, which similarly held the plaintiff exempt.  (JA 73).  Williams's attempts to distinguish *Rieve* on the ground

41

In sum, the record evidence (including Williams's own testimony) establishes conclusively that her primary duties as an FMCM require advanced knowledge. Williams's attempt to recast the record evidence by asserting she was merely a "scribe" find no support in the record evidence, and it is patently insufficient to create a material fact issue sufficient to reverse summary judgment.

## C. The Exercise Of Discretion And Judgment Element Is Satisfied As A Matter Of Law.

In assessing injured workers, developing and managing care plans, and making recommendations for care based on the individual needs of injured workers, Williams indisputably consistently exercises discretion and judgment.

---

she is a mere "liaison," Opening Br. at 36, but *Rieve* itself rejected the same argument by the plaintiff in that case. *See* 870 F. Supp. 2d at 864 ("Plaintiff has taken care to point out the limitations of her position as a FCM, but none of her recited limitations are determinative of the Court's 'advanced knowledge' inquiry. Plaintiff's limitations are similar to the limitations shared by registered nurses in the practice of nursing, who are presumptively exempt from FLSA coverage."). Nor can Williams meaningfully distinguish her duties from the case managers in *Withrow*, another case on which the district court relied. *See* 841 F. Supp. 2d at 987 (granting summary judgment and holding that a medical case manager who was an RN satisfied the professional exemption by using medical knowledge to examine an injured worker's conditions and to provide advice on what to expect from treatments). In contrast, the decisions on which Williams primarily relies are distinguishable. *See Johnson v. Wellpoint*, No. 06-2430, 2009 WL 8753325 (N.D. Ga. Mar. 30, 2009) (unlike here, plaintiffs' supervisor stated that the most important aspect of the job was data entry, that the *plaintiffs spent 80-90 percent of their time entering information into a computer database*, and plaintiffs were evaluated on whether their data inputs were timely); *Cook v. Carestar, Inc.*, No. 11-691, 2013 WL 5477148 (S.D. Ohio Sept. 16, 2013) (unlike here, job required background in *either* nursing *or* social work and material fact issue concerning the ability to be on either of these two tracks precluded summary judgment).

*See* Memorandum and Order (JA 77); *see also* 29 C.F.R. § 541.301(b) (stating that work of advanced knowledge typically requires the "consistent exercise of discretion and judgment"). The standard for the exercise of judgment and discretion for the professional exemption is notably lower than for other exemptions. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employee, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22122, 22151 (Apr. 23, 2004) (noting that "the 'constant exercise of discretion and judgment' standard under the learned professional exemption is less stringent than the 'includes work requiring the exercise of the discretion and independent judgment' standard of the administrative exemption").

Here, GENEX demonstrated that Williams's primary duty included sufficient exercise of discretion and judgment because there is no genuine dispute that on an ongoing basis she evaluated and assessed care options and recommended courses of care/action for injured workers and engaged in analysis and made recommendations free from immediate direction or supervision. Indeed, Williams does not create a genuine dispute that her primary duty was to critically assess, evaluate, and coordinate options of care particular to individual injured workers. *See supra* 8-20. Nor does she create a genuine dispute that after considering various options of care, she set short- and long-term goals for patients

43

and made recommendations to health care providers, employers, and insurers. *See, e.g.,* JA 527-28 (noting that on 7/15/2013 Williams received a call from the patient and "I assured her I would be w/ her and we could ask questions and info, and then discuss after and *make decisions regarding how to move forward*") (emphasis added); JA 534 (stating that Williams's "case activities have assisted with a successful modified RTW and identification of alternate treatment options to address the disability"). These activities alone – not to mention all of the duties described in detail at supra 22-23 – are sufficient grounds to find that Williams exercised the requisite discretion and judgment to qualify for learned professional exemption.

Nonetheless, Williams contends (Opening Br. at 42) that she did not exercise discretion and judgment because: (1) she performed her all her assigned tasks in strict compliance with established guidelines, (2) GENEX or its customers provided her with forms and templates to use, (3) she could not alter the course of an injured employee's treatment, and (4) she is closely supervised. None of these arguments have merit.

**First, although Williams was expected to comply with client billing guidelines and deadlines, they in no way curtailed her exercise of discretion and judgment.** *See, e.g.*, *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 875 (7th Cir. 2008) ("[I]ndependent judgment is not foreclosed by the fact that an

44

employee's work is performed in accordance with strict guidelines."); *Ind. Mich.*
*Power Co. v. Renfro*, 497 F.3d 573, 577 (6th Cir. 2007) (rejecting argument that
guidelines and procedures eliminated employees' use of discretion and
independent judgment); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325
F.3d 997, 1001 (8th Cir. 2003) ("Just because [plaintiff] was required to follow
detailed manuals does not mean she did not exercise discretion and independent
judgment"); *Owsley v. San Antonio Indep. Sch. Dist.,* 187 F.3d 521, 526 (5th Cir.
1999) ("[R]eliance on ... guidelines does not, by itself, indicate the lack of
professional discretion and judgment"); *Withrow*, 841 F. Supp. 2d at 984 ("[E]ven
if it were true that the plaintiffs worked under strict guidelines, this does not
preclude the exercise of discretion and independent judgment"); *see also* 29 C.F.R.
§ 541.704 ("The use of manuals, guidelines or other established procedures
containing or relating to highly technical, scientific, legal, financial or other
similarly complex matters that can be understood or interpreted only by those with
advanced or specialized knowledge or skills does not preclude exemption . . .").
Indeed, the guidelines were not even pertinent to the actual substance of her
analysis.  Rather, the client guidelines merely inform her whether tasks are
"billable" and set the timelines by which the client expected certain tasks to be
completed, e.g., initiate contact with a patient.  *See* Pl's Dep. at 250:3-10 (JA 284).

45

Furthermore, the client guidelines demonstrate that rather than *curtailing* Williams's ability to exercise discretion and independent judgment, the guidelines actually require her to *use* that discretion and judgment:

- The guidelines for Sedgwick require a field medical care manager to develop an initial action plan that "must include short term and long term goals that drive case outcomes and specific action the [field care manager] will take toward medical and [return to work] management." (JA 504);

- Zurich's guidelines ask the care manager to provide "specific recommendations" and remind the manager that "short term goals should be client centered and specific to client objectives." (JA 496);

- Liberty Mutual's guidelines state that the "reports should reflect the nurse case manager's assessment and observations of the patient when meeting with the provider rather than regurgitate the provider's notes." (JA 456); and

- CNA's guidelines expect an FMCM to exercise "critical analysis" in evaluating the medical treatment plan, assessing the case, and in addressing the patient's anticipated return to work, and to work to "seek alternate ways to accommodate the same job with modifications." (JA 486).

Similarly, GENEX's Quality Review Audit Form confirms that the client guidelines do not curtail Williams's discretion and independent judgment. Specifically, Williams was evaluated on whether she:

- Performed an initial assessment or evaluation of the patient that includes an identification of factors that could impede recovery;

- Determined whether the physician's prescribed treatment plan is in compliance with clinical criteria;

46

- Created a patient specific case management plan that sets long- and short-term goals and recommendations with target dates and took appropriate action and plan modification if the client does not meet goals by target date;

- Set measurable long and short-term goals that include criteria for determining whether the goal is successfully achieved; and

- Aggressively attempted to negotiate and coordinate return to work with the healthcare provider, employer and patient.

*See* JA 688-89.

The record evidence thus conclusively establishes that the client guidelines in no way precluded Williams from exercising her discretion and independent judgment to synthesize information she gathered in the field, from providing her professional opinion and analysis, and from developing individually tailored action plans that directed the patient's recovery and return to work. And Williams cites no authority (and we are aware of none) even suggesting that merely complying with clients' expectations somehow eliminates the ability to exercise discretion and judgment.

**Second, similarly flawed is Williams's argument that she does not exercise discretion and judgment because GENEX provides her with "forms and templates" that assist her in conveying information in a consistent matter—an argument that finds no support in the record.** For instance, although Williams had access to templates and form letters, she provides no evidence that using templates and forms was her primary job duty or took up any

47

meaningful amount of her time.  Most critical, although Williams may have had to

use a certain *format* for her reports, she still decided and drafted the *substance* of

those reports and care plans.  *See* Pl's Dep. at 159:2-13 (JA 256); *see also* Job Aid

– Report Writing (JA 396) ("Your report should be full of case management work

rather than paragraphs of what the doctor has said or done. You are hired as a

consultant.  Your report should reflect that."); Service Guidelines for Zurich

Services Corporation (JA 496) (stating expectation for "[s]pecific

recommendations" and that "Short Term Goals should be client centered and

specific to client objectives and expectations").

A review of Williams's care plans and reports thus confirms that she used

discretion and independent judgment in selecting and drafting the content for these

plans and that she did not merely cut and paste information from online resources.

Instead, she determined what information regarding a patient was pertinent and

highlighted her actions and recommendations to advance the patient's return to

work.  For example, in one report, Williams noted that she:

> [A]sked Dr. Waldman if he felt that the claimant could do 10 hrs. of
> sedentary/telephonic work per week.  He said he didn't want her
> driving until therapist says okay when off crutches.  I advised that the
> telephonic work would be from home so driving would not be
> necessary.  He said he did not see a problem with that.

(JA 521); *see also* at JA 529-30 (Williams noting that she "assisted with

determining that therapy was not successful and discussing the issues with the

48

claimant and her counsel" and that she "[s]et up plan of care to advance claimant's abilities and assist with recovery"); JA 543 (after interviewing the patient and reviewing the medical literature, Williams opined that "[t]he Life Care Plan is a vague incomplete representation of future care and fails to present a cogent and accurate clinical representation of the alleged defects of [the patient]."). And in her report concerning one patient, Williams informed the claims adjustor that "[c]laimant has 1 more PT visit authorized (which should be enough)" and that "I think he is safe alone." (JA 469). Williams also recommended that she follow up with the injured worker frequently and that he undergo a neurology consult. *See id.* at JA 469, 472. The record evidence conclusively establishes that Williams uses discretion and judgment in conjunction with her medical knowledge, even if the reports require her to follow a particular template format. *See* Memorandum and Order (JA 76) (noting that Williams's reports contain her analysis of the situation and her "own commentary and suggestions").[16]

**Third, that Williams was not the final decisionmaker for healthcare treatment decisions made by a physician is immaterial.** Her job duties were focused on *managing* healthcare, not providing it. *See supra* at 3-5. In any event, the phrase "discretion and independent judgment" means "that the employee has

---

[16] This testimony conclusively refutes Williams's unsupported assertions (Opening Br. at 26) that if "she does not believe treatment is headed in the proper direction, she would not share that information," that she "does not have any say in a claimant's plan," and that she is nothing more than a "scribe" or an "observer."

[the] authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(b), (c). It "does not require that the decisions made by an employee have finality that goes with unlimited authority and a complete absence of review." *Id.* § 541.202(c); *see also Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 758 (7th Cir. 2013) ("Though Blanchar lacked final decision-making authority, his work involved a great deal of discretion and independent judgment"). Employees thus exercise discretion/judgment "even if their decisions or recommendations are reviewed at a higher level." *Schaefer-LaRose*, 679 F.3d at 577; *accord West*, 137 F.3d at 764 (the "fact that some recommendations made by [an employee] are subject to review by superior officers is no bar to application of the administrative exemption"); *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000) ("Final decision making authority over matters of consequence is unnecessary"). Consequently, these constraints do not preclude Williams's ability to exercise discretion and judgment.

Additionally, the only evidence to support Williams's assertion that she "cannot directly or indirectly control cases" is her statement in her deposition that "the introduction letter that we send out to our patients, it says that we cannot directly or indirectly control cases." *See* Opening Br. at 41 (citing JA 627-628 and 666-667). This "evidence" does not create a genuine dispute because Williams misrepresents what the letter actually says. The introduction letter to which

50

Williams refers does not state that she has no influence over a patient's treatment; rather, it says:

> I do not provide any *direct therapy or nursing care*. I am a medical case manager and assist everyone involved in your treatment in coordinating your medical care. The goal is always to assist you in recovering [and successfully returning to gainful employment as directed by the treatment team]. When applicable, *written notifications of case management action and recommendations* will be mailed to you . . .

Claimant Introduction/Disclosure Letter (Medical) (JA 791); *see also* Nussdorf Dep. at 68:17-71:9 (JA 758-761) (discussing introduction letter and noting Williams has the ability to make suggestions for treatment and that she "can make recommendations but the final say of whether or not someone is going to pay for the service is usually determined by the carrier to court order").

Although the introduction letter confirms that Williams cannot provide direct nursing care (which is not why GENEX employs her or why its clients use her services), it does not support Williams's contention that she cannot influence a patient's treatment or plan to return to work. Williams cites no other document to support her contention that either GENEX or its clients prohibit her from "directly or indirectly" influencing cases. *See* Memorandum and Order (JA 78) ("[E]ven though Williams does not have ultimate decision-making power as to an injured employee's treatment or care plan, she still uses her discretion and judgment to evaluate cases and make recommendations for future courses of action, much like a

51

licensed RN engaged in direct patient care."); *see also Withrow*, 841 F. Supp. 2d at 980, 985 (noting that although plaintiffs did not have authority to authorize treatment, they nonetheless exercised discretion and judgment in assessing claims, creating action plans, making recommendations and "interviewing and interacting with claimants, medical care providers, and attorneys").

**Fourth, and finally, the fact that Williams performed her duties with virtually no oversight from GENEX confirms that she was performing tasks that required her to exercise discretion and judgment** as distinguished from performing routine mental, manual, mechanical or physical work. *See* 29 C.F.R. § 541.301(b). Williams attempts to argue otherwise by conclusorily asserting (Opening Br. at 47-48) that that she was closely and constantly supervised, but her assertions are again flatly contradicted by the record. *See supra* 20-21 (describing how days or weeks can pass without any interactions between Williams and her supervisors and describing the autonomy Williams has in interacting with patients and claims adjustors); *see also Blanchar*, 736 F.3d at 758 (finding employee who "worked largely alone" and rarely met with his supervisor was exempt); *Smith v. Gov't Emps. Ins. Co.,* 590 F.3d 886, 894-95 (D.C. Cir. 2010) (finding adjusters exercised discretion and judgment where the adjusters "worked in the absence of immediate supervision the majority of the time"); *Renfro*, 497 F.3d at 577 (finding employees who did not work under constant supervision were exempt).

52

Although Williams's supervisors edited and ultimately approved the reports and care plans she prepared, she cannot dispute that her supervisors "typically [made] only minor edits to her reports and care plans." *See* Nussdorf Decl. ¶ 6 (JA 345); *see also Smith*, 590 F.3d at 894 ("[F]reedom from immediate direction does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review.") (internal quotation marks omitted); 29 C.F.R. § 541.202(c) ("[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level"). Moreover, the edits "tend to be mere modifications to the grammar/phrasing of [Williams's] observations in contrast to edits to the substance of her observations, findings, and recommendations." Nussdorf Decl. ¶ 6 (JA 345). Williams does not dispute that her supervisors typically deferred to her observations, findings, and recommendations, *i.e.*, they gave her deference in the areas and on issues that require her to use medical knowledge and exercise discretion and judgment. *See* Pl's Dep. at 138:1-18 (JA 777) (Williams confirming that she has no personal knowledge of any edits to her reports). In sum, the record evidence is clear that Williams was not subject to supervision that precluded her ability to exercise discretion and judgment in performing her duties.

53

All elements of the learned professional exemption are thus satisfied here as a matter of law, as the district court correctly held, and summary judgment should be affirmed.

## **CONCLUSION**

For all of the foregoing reasons, the grant of summary judgment should be affirmed.

## **REQUEST FOR ORAL ARGUMENT**

GENEX does not believe that oral argument is necessary to affirm the well-reasoned decision of the district court, but if the Court determines that oral argument would be helpful, GENEX respectfully requests to appear and be allowed to present argument.

Dated:          November 26, 2014          Respectfully submitted:


By:  /s/ Michael J. Puma

Michael J. Puma
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:  215.963.5305
Facsimile:  215.963.5001
mpuma@morganlewis.com

Allyson N. Ho
MORGAN, LEWIS & BOCKIUS
1717 Main Street, Suite 3200
Dallas, TX  75201
Telephone:   214.466.4180
Facsimile:  214.466.4001
aho@morganlewis.com

Russell R. Bruch
MORGAN, LEWIS & BOCKIUS
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  202.739.5293
Facsimile:  202.739.3001
rbruch@morganlewis.com


*Counsel for Defendant-Appellee
GENEX Services, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

 [ X ] this brief contains [12,554] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

 [  ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

 [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

 [  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 26, 2014     /s/ Russell Bruch
             *Counsel for Appellee*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 26th day of November, 2014 I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Nicholas Woodfield
> R. Scott Oswald
> THE EMPLOYMENT LAW GROUP, P.C.
> 888 17th Street, NW, 9th floor
> Washington, D.C. 20006
> Telephone: 202.261.2806
> Facsimile:  202.261.2835
> nwoodfield@employmentlawgroup.com
> soswald@employmentlawgroup.com
>
> *Counsel for the Appellant*

I further certify that on this 26th day of November, 2014, I caused the required copies of the Response Brief of Appellee to be delivered via FedEx to the Clerk of the Court.

/s/ Russell Bruch
*Counsel for Appellee*